No. 76,921

STATE OF KANSAS, *Appellee*, v. MARVIN L. CANAAN, *Appellant*.

(964 P.2d 681)

836

Opinion filed July 24, 1998.

*Steven R. McConnell*, deputy appellate defender, argued the cause, and *Mary Curtis*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were on the brief for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Paul J. Morrison*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant Marvin Canaan was convicted of premeditated murder, aggravated robbery, and aggravated burglary. Defendant appeals, claiming the district court failed to: (1) sup-

press evidence seized in a warrantless search; (2) suppress defendant's statements made in the emergency room; (3) conduct a *Frye* hearing as to the admissibility of luminol testing; and (4) permit cross-examination of a prosecution witness.

## FACTS:

Sometime in the morning hours of October 20, 1994, Michael Kirkpatrick was murdered. The evening before, he was observed at a bar with Canaan. During the investigation, the victim's neighbor, Jerry Staley, informed police that Canaan had been at the victim's house the evening before and had been driving a maroon Oldsmobile. Because the victim had been with Canaan, Detective Harold Hughes of the Johnson County Sheriff's office and an officer from the Gardner Police Department went to Canaan's home to ask what Canaan knew of the murder. The officers observed a maroon Oldsmobile at Canaan's home.

Canaan's wife informed Hughes that her husband would be home about 1 p.m. and that he was driving a Dodge Ramcharger pickup truck. In response to Hughes' questions, Canaan's wife said that Canaan had been wearing a white pullover shirt and burgundy jogging pants that evening. She told Hughes that the pants Canaan wore had been washed and dried but the shirt was in the washer. At the officer's request, she removed the shirt from the washing machine and gave it to him.

After leaving Canaan's home, the officers were informed that the defendant's pickup was parked near the pharmacy in Gardner, Kansas. The officers proceeded to the pharmacy, parked, and waited for Canaan to appear.

Less than 5 minutes later, Canaan returned to the pickup and drove west on U.S. Highway 56. The officers believed Canaan was driving home from the pharmacy. When he turned on 183rd Street in Gardner, the officers realized Canaan was not going home. The officers followed. On the gravel road Canaan sped up to approximately 55 mph. The speed limit was 35 mph.

After Canaan had accelerated to 55 mph, the officers activated their lights and siren and Canaan stopped. When Hughes ap-

proached, Canaan observed the officer's identification and accelerated away. The chase reached speeds up to 75 mph.

After running three stop signs, Canaan's pickup crashed into a tree. Detective Hughes called for emergency medical assistance, approached the wrecked pickup, and found Canaan lying on the passenger side of the truck unconscious. Hughes did not open the truck door. Canaan was removed from the truck and placed on a stretcher by EMS attendants.

Captain Jones (Johnson County) arrived and began to investigate the scene of the crash. He observed a gray wallet lying on the ground just outside the pickup's passenger door. To identify the driver, Jones removed the driver's license. It was Canaan's license. Jones then noticed a black wallet on the floorboard of the truck. Jones examined this wallet and found it contained the murder victim's driver's license. Jones replaced the victim's license and wallet where he had found it.

Later that day, Detective Hughes obtained a warrant to search Canaan's pickup for

"hair, blood, fibers, pair tennis shoes, blue jacket, and any other clothing which exhibits damage to fabric which could have been caused by cutting or has tissues or blood on it, knives or sharp edged instruments, U.S. currency, illegal narcotics, evidence written or otherwise indicating illegal narcotics transactions, and *wallet*." (Emphasis added.)

At the hospital, Detective Scott Atwell was assigned to stay with Canaan until he was released. Atwell, who was not aware of Canaan's connection to the murder investigation, was to ascertain where Canaan was going, if he was released from the hospital.

While at the hospital, Atwell received a telephone call from a superior officer telling him to photograph Canaan's injuries. Atwell believed, and he told Canaan, that the pictures were for the accident investigation. Canaan agreed to be photographed. While the officer photographed the wounds, Canaan told Atwell that he (Canaan) could verify that he did not have the wounds prior to the accident.

Later, Canaan asked Atwell if he knew where his wallet and clothing were. Atwell told Canaan there was a black wallet with a velcro closure on the floorboard of the truck. Canaan said the black

wallet was not his. Atwell then asked whose wallet Canaan thought it was. Canaan did not respond.

Canaan also informed Atwell that he did not remember the accident. In response, Atwell asked why Canaan did not stop. Canaan responded that there was cocaine in the pickup that belonged to someone else.

Upon being taken to a regular hospital room, Canaan telephoned his wife. After this conversation, Canaan told Atwell that he now understood why the officers wanted to talk to him. Detective Atwell asked, "Why?" Canaan responded that the officer wanted to ask him about a murder in Edgerton.

During the investigation, the police requested John Wilson of the Regional Crime Lab to conduct luminol tests. Wilson tested Canaan's Oldsmobile and house.

Canaan filed three separate motions to suppress evidence. Prior to trial, Canaan first moved to suppress the introduction of the black wallet found in the pickup and its contents, and testimony as to the wallet. Canaan asserted that there was no probable cause for the officers to stop him because no warrant had been issued for his arrest and there was no reasonable articulable suspicion that he had committed, was committing, or was about to commit a crime. The district court ruled:

"With respect to the defendant's Motion to Suppress regarding the stop, the Court would find that Detective Hughes had a reasonable suspicion to stop the defendant's vehicle; that the observation of the wallet by Captain Jones and the cursory check of identification was reasonable; that the [subsequent] search of the automobile [sic] pursuant to warrant was proper and not tainted by the actions of Captain Jones [policeman who examined the black wallet at the scene]."

Canaan then moved to suppress his statements to Atwell at the hospital. The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires a trial judge, where there is a proper objection, to make a preliminary examination as to the voluntariness of a confession offered by the prosecution, resolve evidentiary conflicts, and submit to the jury only those confessions he or she believes to be voluntary. *Jackson v. Denno*, 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964). After a *Jackson v. Denno* hearing, the district judge ruled that Canaan's statements

to Atwell were not made while Canaan was in custody and therefore were admissible.

Canaan then filed a third motion asserting that the luminol testing failed to meet "the criteria of admissibility of scientific tests as set forth in *Frye, Lowry,* and *Deppish.*" The district court found that "[t]he luminol testing . . . has widespread acceptance, it's not novel or new, and obviously the State must lay its foundation, but the Court will not require a *Frye* test."

Canaan brings this direct appeal of his convictions for premeditated murder, aggravated robbery, and aggravated burglary.

## ISSUES ON APPEAL
### Failure To Suppress Evidence

The Fourth and Fourteenth Amendments to the United States Constitution prohibit unreasonable searches and seizures. Unless a search falls within one of a few exceptions, a warrantless search is per se unreasonable. *Katz v. United States*, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). Upon the hearing of a motion to suppress evidence, the State bears the burden of proving to the trial court the lawfulness of the search and seizure. *State v. Damm*, 246 Kan. 220, 222, 787 P.2d 1185 (1990)(citing *Mincey v. Arizona,* 437 U.S. 385, 390-91, 57 L. Ed. 2d 290, 98 S. Ct. 2408 [1978]). If the State fails to meet its burden, the evidence seized is excluded.

The "exclusionary rule" also prohibits the admission of the "fruits" of illegally seized evidence, *i.e.,* any information, object, or testimony uncovered or obtained directly or indirectly as a result of the illegally seized evidence or any leads obtained therefrom. This exclusionary principle is known as the "fruit of the poisonous tree doctrine."

In recent years, the United States Supreme Court has limited the applicability of the exclusionary rule. The exclusionary rule does not apply if the connection between the illegal police conduct and the seizure of the evidence is "so attenuated as to dissipate the taint." *Segura v. United States*, 468 U.S. 796, 805, 82 L. Ed. 2d 599, 104 S. Ct. 3380 (1984). For example, if the evidence was

seized pursuant to an independent source, it would be admissible at trial.

Canaan argues that (1) the seizure of the black wallet found on the floor of his truck does not fall within one of the well-delineated exceptions to the requirement for a search warrant and thus is per se unreasonable and illegal, and (2) the search warrants issued to search his truck, Oldsmobile, and house were based upon the illegal seizure of the black wallet. Therefore, according to Canaan, all evidence seized during execution of the search warrants must be suppressed as the fruit of the poisonous tree.

At the suppression hearing, Detective Hughes testified that after he saw Canaan speeding, he activated his lights and siren. Hughes acknowledged he was not stopping Canaan for speeding, but to talk to Canaan about the murder. The State argued to the district judge that where an officer observes a traffic infraction, a stop is lawful, even though pretextual. For support, the State cited *Whren v. United States*, 517 U.S. 806, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996).

In *Whren*, plainclothes police officers patrolling a "high drug area" noticed violations of traffic laws. After pulling over the offending driver, they observed and seized two plastic bags containing what appeared to be crack cocaine.

In moving to suppress the evidence, Whren argued that in traffic cases there is a high susceptibility to impermissible pretextual stops by law enforcement officers based on illegal factors such as race. Whren argued that under the circumstances the standard should be, disregarding the traffic violation, whether a reasonable officer would have pulled over an individual. The Supreme Court rejected this argument and held subjective intentions of the officer play no role in ordinary probable cause Fourth Amendment analysis. 517 U.S. at 813.

Under *Whren*, it does not matter that Hughes initially pulled Canaan over to question him about the murder; the officer's observation of a traffic infraction provided sufficient probable cause for the officer to justify stopping Canaan. We point out that Canaan was not "stopped" by the officer. Canaan stopped when the vehicle he was driving crashed into a tree while he was fleeing from the

officer. The general rule is that flight after the commission of a crime may be an indication or admission of guilt and admissible regardless of the time or stage in the proceedings when the flight occurs. It is not necessary that the flight occur immediately after the perpetration of the crime. It may occur before filing formal charges, before arrest, after indictment, or after arrest. *State v. Walker*, 226 Kan. 20, 22, 595 P.2d 1098 (1979); see *State v. Bowman*, 252 Kan. 883, 891, 850 P.2d 236 (1993).

However, it is important to note that probable cause to stop Canaan is not the same as probable cause to search Canaan's vehicle. The question is, under the circumstances, whether the evidence found in Canaan's pickup, Oldsmobile, and house was admissible. The State argues there was sufficient evidence independent of the wallet to support probable cause to issue the search warrants obtained before and after the accident. The State points out that Captain Jones retrieved the black wallet from the pickup to identify the crash victim. According to the State, Jones was required by statute to identify and verify the driver involved in the accident.

Captain Jones testified:

"I wasn't sure who the driver of the vehicle was. I had a driver's license that said Marvin Canaan, but I didn't know if that was Marvin Canaan they had on the stretcher or not. So I retrieved the other wallet to see if I could get identification."

The State's argument is supported by statute. K.S.A. 8-1611 provides:

"(a) Every law enforcement officer who:
"(1) Investigates a vehicle accident of which a report must be made as required in this article; or
"(2) otherwise prepares a written report as a result of an investigation either at the time of and at the scene of the accident or thereafter by interviewing the participants or witnesses, when such accident under paragraphs (1) or (2) results in injury or death to any person or total damage to all property to an apparent extent of $500 or more, shall forward a written report of such accident to the department of transportation within 10 days after investigation of the accident.
"(b) Such written reports required to be forwarded by law enforcement officers and the information contained therein shall not be privileged or held confidential."

K.S.A. 8-1612 provides:

"(a) The department of transportation shall prepare and upon request supply to police departments, sheriffs and other appropriate agencies or individuals, forms for written accident reports as required in this article, suitable with respect to the persons required to make such reports and the purposes to be served. The written reports shall call for sufficiently detailed information to disclose, with reference to a vehicle accident, the cause, conditions then existing and the persons and vehicles involved."

When Captain Jones, while investigating the accident scene, opened the wallet and observed the victim's driver's license in the black wallet, the plain view doctrine applied. Under the plain view exception to the search warrant requirement, a law enforcement official can seize evidence of a crime if "(1) the initial intrusion which afforded authorities the plain view is lawful; (2) the discovery of the evidence is inadvertent; and (3) the incriminating character of the article is immediately apparent to searching authorities." *State v. Parker*, 236 Kan. 353, Syl. ¶ 2, 690 P.2d 1353 (1984).

Captain Jones had a duty to acquire information sufficient to investigate and report on the accident. He recognized that the murder victim's wallet was evidence of a separate crime and returned the wallet to where he found it, sealed the vehicle with tape, and ordered the vehicle treated as a crime scene, *i.e.*, evidence in the murder of Michael Kirkpatrick. This was proper.

The State does not claim the officers were conducting a search incident to an arrest, nor does it claim they had probable cause and exigent circumstances justifying a warrantless search. Rather the State contends the initial search was to obtain information required by statute, and the information leading to the arrest was provided by that search and a subsequent inventory search.

An inventory search of a motor vehicle is a warrantless search and is not valid unless the police first have lawful custody of the vehicle. See *State v. Boster*, 217 Kan. 618, 624, 539 P.2d 294 (1975). Police may legally impound a vehicle if authorized by statute or if there are reasonable grounds for impoundment. 217 Kan. at 624 (citing *State v. Singleton*, 9 Wash. App. 327, 511 P.2d 1396 [1973]). An officer impounding a vehicle may make a "warrantless inventory search of the personal property within the vehicle, in-

cluding the glove box and trunk, when the same may be accomplished without damage to the vehicle or its contents." *State v. Fortune*, 236 Kan. 248, Syl. ¶ 5, 689 P.2d 1196 (1984).

When the owner, operator, or person in charge of a vehicle is capable and willing to instruct police officers as to the vehicle's disposition, then absent some other lawful reason for impounding the vehicle, the person should be consulted, and his or her wishes followed concerning the vehicle's disposition. If the impoundment of the vehicle is unreasonable and, therefore, unlawful, the inventory search following impoundment is unlawful. All evidence obtained through an unlawful search is inadmissible and must be suppressed. *State v. Teeter*, 249 Kan. 548, 552, 819 P.2d 651 (1991).

According to the *Singleton* court, and cited with approval by the *Boster* court, one circumstance that constitutes reasonable grounds for impoundment is where the police remove " 'an unattended-to car from the scene of an accident when the driver is physically or mentally incapable of deciding upon steps to be taken to deal with his property, as in the case of the intoxicated, mentally incapacitated or seriously injured driver.' " 217 Kan. at 624 (quoting *Singleton*, 9 Wash. App. at 332-33). We reaffirmed this factor as grounds for impoundment in *State v. Teeter*, 249 Kan. at 552.

After the accident, Canaan was unconscious and was taken to the hospital and admitted. He was incapacitated and "incapable of deciding upon steps to be taken to deal with his property." The police had little choice but to seize the vehicle to assure the security of the property. There were two wallets in plain view. In light of these facts, an inventory search was justified to protect the police from any tort claims that might later be asserted. See *Boster*, 217 Kan. at 623. All evidence discovered at the scene of the accident was lawfully obtained.

Defendant argues evidence seized during execution of the search warrants was fruit of the poisonous tree, *i.e.*, the discovery of the victim's wallet. The State argued that the victim's wallet would have been discovered when the search warrant for narcotics and currency in the pickup was executed. Therefore, the inevitable discovery doctrine applied.

The inevitable discovery/independent source doctrine allows admission of evidence that could have been discovered by means wholly independent of any constitutional violation. For unlawfully obtained evidence to be admitted, the prosecution must establish by a preponderance of the evidence that the unlawfully obtained evidence ultimately or inevitably would have been discovered by lawful means. The prosecution need not prove the absence of bad faith in obtaining the evidence. *Nix v. Williams*, 467 U.S. 431, 81 L. Ed. 2d 377, 104 S. Ct. 2501 (1984).

The State's argument is without merit because there was no independent source in that the same officers were involved in the homicide investigation and the accident investigation. Additionally, as previously determined, there is no poisonous tree. However, because the district judge signed search warrants to search both of defendant's vehicles and his house, we review whether there was probable cause for the warrants to search Canaan's vehicle and his house as part of the murder investigation. Before a search warrant may be issued, there must be a finding of probable cause by a neutral and detached magistrate. The application for a search warrant and supporting affidavits should supply the magistrate with sufficient factual information to support an independent judgment that probable cause to search exists. *State v. Gilbert*, 256 Kan. 419, 424, 886 P.2d 365 (1994).

In determining whether to issue a search warrant, a magistrate should consider the "totality of the circumstances" presented and make a practical, common-sense decision whether there is a fair probability that a crime has been or is being committed and the defendant committed the crime, or that contraband or evidence of a crime will be found in a particular place. On appeal, the duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant. *State v. Gilbert*, 256 Kan. at 424 (quoting *State v. Abu-Isba*, 235 Kan. 851, Syl. ¶¶ 1, 2, 3, 685 P.2d 856 [1984]).

The affidavit filed seeking the search warrant does not mention that "the wallet" to be seized contained the murder victim's driver's license. Therefore, there is no need to determine whether a detached magistrate signed the warrant on the basis of the contents

of the wallet. Instead, we examine the search warrant affidavit to determine whether there was a substantial basis for concluding there was probable cause that a crime was committed and that the objects of the search might yield evidence of the crime.

The affidavit for the warrant stated that the victim had been stabbed to death; Canaan had been seen with the victim the night before; Canaan's wife told the police that at one time Canaan owned large hunting-type knives; Canaan refused to stop and fled when emergency equipment was activated, resulting in his crash the day after the murder; and the victim and Canaan were believed to be involved in illegal narcotics. The search warrant affidavit was based on other evidence and not premised on Captain Jones' discovery of the victim's wallet at the scene of the wreck.

" 'Probable cause' to issue a search warrant is like a jigsaw puzzle. Bits and pieces of information are fitted together until a picture is formed which leads a reasonably prudent person to believe a crime has been or is being committed and that evidence of the crime may be found on a particular person or in a place or means of conveyance." *State v. Morgan*, 222 Kan. 149, 151, 563 P.2d 1056 (1977).

The facts provided in the affidavit create a picture from which a reasonable magistrate could find probable cause to issue a search warrant.

Because there was no fruit from the poisonous tree, and the affidavit contained sufficient information for a reasonable magistrate to issue the search warrant, the search warrant was valid and the evidence obtained from that search was properly seized.

### Statements Violative Of *Miranda*?

Canaan sought to suppress his conversations with Detective Atwell in the hospital emergency room as violative of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). The *Miranda* rule requires that a person must be warned of certain rights prior to any questioning initiated by law enforcement officers after that person is taken into custody or deprived of his or her freedom in any significant way (detained).

"Custody" means the restraint of a person pursuant to an arrest or the order of a court or magistrate. "Detention" means the tem-

porary restraint of a person by a law enforcement officer. K.S.A. 22-2202(9), (10).

Canaan asserts that the test is whether reasonable persons would believe themselves to be in custody. He argues he was not free to leave the hospital or able to move around without help. Canaan also argues that because he had been chased by the police prior to the accident and escorted to the hospital by the police after the accident, reasonable persons would believe he or she was in custody.

This argument is not supported by the facts. Canaan was neither arrested nor restrained while at the hospital. He was alone for significant periods of time. Canaan was not arrested for the murder until months after his release from the hospital. The evidence is uncontroverted that the initial reason the police were at the hospital was to find out when Canaan was to be released so that they could later question him about the murder. There is no evidence that Canaan was deprived of his liberty by the police at the hospital. The district court did not err in concluding that Canaan was not in custody or detained; therefore, no violation of *Miranda* occurred.

### Admissibility of Luminol Testing

During the course of the investigation, John Wilson performed a luminol test on the Oldsmobile Canaan was driving the night of the murder. The luminol test indicated the possible presence of blood on the left corner of the driver's seat and door panel.

An additional luminol test of Canaan's home by Wilson indicated the presence of bloody footprints on the front porch and step and down the main hallway into the master bedroom. According to Wilson, the footprints turned at the edge of the bed as if someone turned and sat down on the bed. Finally, the luminol reacted when it contacted a watch on a nightstand in Canaan's bedroom. These items were tested again. A second presumptive test by use of phenolphthalein confirmed the reaction to blood on the Oldsmobile seat.

DNA tests were later conducted by Valerie Fahrnow, a forensic chemist for the Johnson County Crime Lab, on a white shirt owned

by Canaan and on the watch that was on the nightstand. The luminol's reaction to the watch was confirmed by a DNA test. The blood on the watch was not statistically similar to the blood of the victim or Canaan, but was consistent with the blood of Jerry Staley, the individual who discovered the murder victim. Staley had previously told the officers he had traded the watch to the victim for cocaine.

Canaan filed a pretrial motion requesting a *Frye* hearing as to the admissibility of luminol testing. See *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). The *Frye* test requires that before expert scientific opinion may be received into evidence, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. The State has the burden of satisfying the *Frye* test by proving the reliability of the underlying scientific theory upon which the luminol test is based. If the validity of the new scientific technique has not been generally accepted as reliable or is only regarded as an experimental technique, then expert testimony based upon its results should not be admitted into evidence. *State v. Hill*, 257 Kan. 774, Syl. ¶ 4, 895 P.2d 1238 (1995).

Whether an expert or lay witness is qualified to testify as to his or her opinion lies within the discretion of the trial court, and the district court will not be reversed on appeal absent a showing of abuse of discretion. *City of Dodge City v. Hadley*, 262 Kan. 234, 241-42, 936 P.2d 1347 (1997). The district court ruled that "[t]he luminol testing . . . has widespread acceptance [in the scientific community], it's not novel or new, and obviously the State must lay its foundation, but the Court will not require a *Frye* test." Judge Cleaver required that a foundation be laid on luminol testing.

At trial, Canaan renewed his objection to the introduction of luminol evidence, asserting luminol is only a presumptive test for blood. In other words, it may indicate the presence of blood, but also reacts similarly with other materials, including common household cleansers. The district court overruled the defendant's objection, ruling that the fact the luminol test is a presumptive test goes to the weight, rather than the admissibility, of the evidence.

On appeal, Canaan argues the district judge should have conducted a *Frye* hearing because Kansas has never determined the reliability of luminol evidence. Additionally, Canaan argues for the first time on appeal that there was no evidence that "John Wilson was qualified to testify as an expert in the field of luminol testing techniques or as to the validity and reliability of the exact techniques he used in this case." Canaan cites *State v. Miller*, 240 Kan. 733, 732 P.2d 756 (1987), and *State v. Witte*, 251 Kan. 313, 836 P.2d 1110 (1992), for the proposition that the *Frye* test is both an evidentiary and foundational standard.

The *Witte* court observed that the *Frye* court

" ' "deliberately intended to interpose a substantial obstacle to the unrestrained admission of evidence based upon new scientific principles. . . . Several reasons founded in logic and common sense support a posture of judicial caution in this area. Lay jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials. We have acknowledged the existence of a '. . . misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature.' " '

" '. . . Courts should be reluctant to resolve the disputes of science. It is not for the law to experiment, but for science to do so. Without the *Frye* test, juries would be compelled to make determinations regarding the validity of experimental or novel scientific techniques. As a result, one jury might decide that a particular scientific process is reliable, while another jury might find that the identical process is not. Such inconsistency concerning the admissibility of a given scientific technique or process in criminal cases would be intolerable.' " 251 Kan. at 323 (quoting *State v. Washington*, 229 Kan. 47, 54, 622 P.2d 986 [1981]).

Following the rationale of *Frye*, both *Miller* and *Witte* required the State to prove the reliability of the underlying science and the acceptance of it in the appropriate scientific field. However, Canaan misinterprets these cases. Only when there is a doubt as to the scientific reliability of evidence must the State prove the reliability and acceptance of the science.

Canaan then claims that the State did not lay a proper foundation for Wilson to testify about luminol. We note that the trial court did not require the State to prove the scientific basis for the use of luminol because it found luminol testing is universally accepted. The trial court did require the State to lay a foundation as to Wilson's qualifications to administer the test. Canaan did not object to

Wilson's qualifications or methods for administering the test until this appeal. A party may not raise an issue for the first time on appeal. However, a review of Wilson's testimony shows he was clearly qualified to administer the luminol tests and that the underlying science was reliable and accepted.

At trial, John Wilson testified that he has been the chief chemist at the Regional Crime Lab in Kansas City since 1978. Besides supervising other forensic chemists, he analyzes various types of trace evidence (such as blood) and also responds to crime scenes upon request. He is involved in teaching two crime scene classes a year for local law enforcement in Kansas and Missouri to train people how to proceed at crime scenes. He is also involved in teaching some specialized classes, 1-day seminars at local colleges, and occasional classes at various association meetings.

Wilson, who has a degree in biology and chemistry, testified that he had worked at the Johnson County Crime Lab 2 years prior to becoming the chief chemist for the Regional Crime Lab in 1978. Wilson started as a forensic chemist at the Kansas City, Missouri, police lab in 1973 and has been involved in forensic chemistry for approximately 23 years. Wilson has attended a number of classes and various seminars with the American Academy of Forensic Science (an association of forensic scientists). He has also attended a number of seminars at the FBI academy in Quantico, Virginia, and classes on blood analysis at the University of California.

Wilson further testified that he has received training in luminol testing. He has completed a number of classes at the FBI academy, including a crime scene investigation course, and has attended various seminars with the American Academy of Forensic Scientists and the Midwest Association of Forensic Scientists.

Wilson testified that luminol testing has been used by forensic scientists for about 60 years. It has been available for approximately 80 years and scientific papers on luminol were published in the 1920's. He testified that he had conducted luminol testing hundreds of times and has testified as an expert witness in other criminal cases over the years regarding the results of luminol testing.

Wilson explained how luminol testing works: Luminol is a chemical that reacts with blood and undergoes a chemical reaction that

gives off light (chemiluminescence). When blood and luminol come into contact, it essentially causes a very faint blue glow that one can see in the dark. Luminol testing works by placing a luminol reagent in very small concentrations in a sodium hydroxide water solution and then placing it in a spray mister, which creates a very fine mist. The forensic chemist makes the area as dark as possible because the actual spraying needs to occur in total darkness. The forensic chemist then begins spraying the very fine mist in the area to be searched for blood stains. If blood is present, a chemical reaction causes a blue glow. The chemiluminescence of the blood and luminol mixture occurs if it is dark enough and there is enough blood present. Luminol testing is extremely sensitive, depending on what one is looking for and what surface is being sprayed. It is sensitive to 1:1,000,000 to 1:10,000,000 parts per million.

Wilson testified that luminol testing is fairly specific for blood and that there are few things other than blood that cause luminol to react. Forensic scientists use it to locate crime scenes that have been cleaned up and are then able to reconstruct what occurred at the crime scene. They could determine the sequence of events, where the blood was, perhaps how it was cleaned up, and maybe even tracks made by footprints that have blood on them. Luminol can show things like tire tracks, shoe prints, and handprints that are made in blood. The duration of the luminescent results of a positive test before fading will vary. It can last from a few seconds to several minutes. Ideally, it would last long enough to photograph. The time it remains luminescent depends upon the material the blood is on and how the spray that is being used affects it. In his years of experience, Wilson has had occasion to have positive luminol results for footprints 20 to 50 times. There was one occasion where he was able to follow a person outdoors across a public park for over a quarter of a mile. Wilson stated that the luminol test is generally accepted as a presumptive test for blood in the scientific community of forensic science and is recognized as reliable within the scientific community of forensic scientists.

In *State v. Stenson*, 132 Wash. 2d 668, 940 P.2d 1239 (1997), the defendant challenged the admissibility of phenolphthalein, a chemical similar to luminol in that it is also a presumptive test for

blood. The Washington court noted that Florida, California, and Alabama all permit the introduction of evidence that is presumptive for blood. In analyzing how the presumptive blood evidence was used during the trial, the *Stenson* court held the introduction of presumptive blood test results were admissible so long as the evidence indicates that the test used was a presumptive test only and does not confirm the material tested contains blood. In *Stenson*, there was significant testimony that the test was only presumptive. There was also testimony about what types of material besides blood could cause a false positive. The *Stenson* court observed that the fact the test was only presumptive went to the weight, rather than the admissibility, of the test. 132 Wash. 2d at 714, 718. Other states have accepted the introduction of luminol evidence. See, *e.g.*, *People v. Hendricks*, 145 Ill. App. 3d 71, 87, 495 N.E.2d 85 (1986); *State v. Jones*, 213 Neb. 1, 6-7, 328 N.W.2d 166 (1982).

Arkansas requires a follow-up test to luminol testing to confirm the presence of human blood *related to the crime* because luminol can return false positive results by reacting to material other than human blood. Additionally, luminol is not time specific. According to Arkansas courts, luminol evidence, without additional factors relating the results to the crime, may confuse a jury. *Houston v. State*, 321 Ark. 598, 600, 906 S.W.2d 286 (1995). Similarly, Hawaii has rejected the introduction of luminol tests without confirming tests that indicate blood relevant to the crime scene, finding them more prejudicial than probative. *State v. Fukusaku*, 85 Hawaii 462, 496-97, 946 P.2d 32 (1997).

The use of luminol is universally accepted as a presumptive test for blood. The State sought its admission as a presumptive test. The State satisfied the *Frye* test by proving the reliability of the underlying scientific theory upon which the luminol test is based. The scientific technique upon which the luminol test is based has been generally accepted as reliable, and Wilson had been trained to follow the procedures established to test the phenomenon and used those methods properly pursuant to the training.

The fact that luminol also detects some other substances is irrelevant to its universal acceptance as a presumptive blood test.

This fact goes to the weight, not the admissibility, of the evidence. In challenging the weight of this evidence, the defendant elicited testimony that informed the jury that luminol also reacts to other substances.

### Right To Cross-Examine

The scope of cross-examination is a matter within the sound discretion of the trial court and, absent a clear showing of abuse, the exercise of that discretion will not constitute prejudicial error. *State v. Westfahl*, 21 Kan. App. 2d 159, Syl. ¶ 3, 898 P.2d 87, *rev. denied* 258 Kan. 863 (1995). The admission or exclusion of evidence, subject to exclusionary rules, is within the trial court's discretion. Discretion is abused only when judicial action is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the trial court's view. *State v. Haddock*, 257 Kan. 964, 978, 897 P.2d 152 (1995).

One of Canaan's theories was that Jerry Staley committed the murder. The defense sought to impeach the testimony of Staley and his credibility during the State's case in chief. During its case in chief, the State limited its questions of Staley to the last time he had seen the victim alive, what he had done between the time he had seen the victim alive and when he had found the victim, and what he had done upon finding the victim. Canaan attempted to introduce his theory of the case in his cross-examination of Staley. None of Canaan's attempts to impeach Staley during cross-examination went to the facts to which Staley previously had testified during direct examination. The trial court informed the defense attorney he could elicit further testimony by recalling the witness when presenting defense evidence.

At trial, Staley, the victim's neighbor who had purchased cocaine from the victim on the night in question, testified for the State. Staley testified he purchased cocaine at 2:30 a.m. the day of the murder. He also testified to finding the victim's body. On cross-examination, defense counsel began to question Staley about interviews Staley had with the police where he indicated he had been to the victim's apartment numerous times the evening before the body was discovered. The district court sustained the State's ob-

jection that defense counsel's question went beyond the scope of the State's direct examination.

When defense counsel sought on cross-examination to impeach Staley's credibility by bringing out statements that Staley had been to the victim's apartment numerous times the evening prior to the murder, the State objected. The trial court sustained the State's objection to the cross-examination as beyond the scope of direct. Defense counsel then asked specific questions regarding Staley's telling the police he had visited the victim other times during the evening. After discussing Staley's statement to the police indicating Staley had used cocaine with the victim two other times during the evening, the State again objected. The district court again sustained the State's objection, finding that the defense's cross-examination exceeded the scope of the State's direct examination.

Canaan cites numerous cases stating that limiting cross-examination to the scope of direct may unconstitutionally interfere with a defendant's Sixth Amendment right to a fair trial. The facts in those cases are not similar to our circumstances.

Cross-examination may be permitted into matters which were subject of direct examination. Where general subject matter has been opened up on direct, cross-examination may go to any phase of the subject matter and is not restricted to identical details developed or specific facts gone into on direct examination. Questions asked on cross-examination must be responsive to testimony given on direct examination, or material and relevant thereto. *State v. Hobson*, 234 Kan. 133, Syl. ¶ 8, 671 P.2d 1365 (1983).

The district court limited defense's cross-examination to the scope of the State's direct examination. When limiting the cross-examination, the trial judge informed defense counsel that other contacts Staley had with the victim could be admitted during the defense's presentation of its case in chief. The trial court merely delayed the presentation of evidence and did not prohibit the admission of the evidence. There was no abuse of discretion.

Affirmed.