IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,458

STATE OF KANSAS,
*Appellant*,

v.

JULIA COLLEEN EVANS,
*Appellee*.

SYLLABUS BY THE COURT

1.

In construing the command for reasonable searches under the Fourth Amendment to the United States Constitution, the United States Supreme Court has held that a search of private property is unreasonable unless it has been authorized by a valid search warrant or one of the specifically established and well-delineated exceptions to the warrant requirement.

2.

Law enforcement officers have discretion in conducting inventory searches so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.

3.

An essential predicate to any valid warrantless seizure of incriminating evidence under the plain-view exception to the warrant requirement is that a law enforcement officer cannot have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. In addition, the evidence's incriminating character must be immediately apparent.

1

4.

Where a container is involved, complying with the warrant requirement or one of its well-delineated exceptions is required because the Fourth Amendment provides protection to the owner of every container if the container conceals its contents from plain view.

5.

Under the facts of this case, the State failed to meet its burden of demonstrating that a specifically established and well-delineated exception to the warrant requirement permitted the search for a driver's license in an automobile driver's purse and wallet.

Appeal from Dickinson District Court; BENJAMIN J. SEXTON, judge. Opinion filed November 21, 2018. Affirmed and remanded.

*Daryl E. Hawkins,* assistant county attorney, argued the cause, and *Andrea Purvis*, county attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellant.

*Whitney T. Kauffeld*, assistant public defender, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Julia Colleen Evans argues law enforcement officers violated her rights under the Fourth Amendment to the United States Constitution when they conducted a warrantless search of her purse and wallet after an ambulance took her from the scene of an automobile accident. To justify the constitutionality of the search, the State must establish the law enforcement officers conducted a search under authority of a warrant or one of the specifically established and well-delineated exceptions to the warrant requirement. Here, the State relies on the plain-view exception and the officer's

administrative caretaking function of locating a driver's license to complete an accident report. The district court held the State had not met its burden of establishing the application of an established exception to the warrant requirement, and we affirm.

FACTS AND PROCEDURAL HISTORY

The State charged Evans with two counts:  (1) unlawful possession of methamphetamine and (2) possession of drug paraphernalia after officers performing a warrantless search of her purse and wallet found evidence of those crimes. Evans moved to suppress evidence, and the district court held an evidentiary hearing on Evans' motion. The State presented testimony from Dickinson County Sheriff's Deputy Mark Longbine and Abilene Police Department Sergeant Mark Haaga.

Deputy Longbine testified he responded to a call of a car accident on I-70. At the scene, Longbine observed it appeared the driver "went off the side of the road, and went up the incline, and flipped one time, and landed with the door against" a pole. Longbine approached the car and found Evans was in pain and distraught. Longbine talked to her, and learned her first name.

Sergeant Haaga arrived to assist Deputy Longbine. Shortly after Haaga arrived, Longbine left the scene to respond to another call. Haaga spoke with the driver, who said her name was Julia Evans. She also told him she did not want to have an ambulance. She informed him she had called her ex-boyfriend. Haaga knew the ambulance was almost at the scene and knew emergency personnel would have to extract Evans from the car. Haaga noticed no signs Evans was impaired, nor did he detect any smell of alcohol, marijuana, or anything else emanating from the car.

3

Once emergency personnel arrived, Sergeant Haaga directed traffic while the emergency personnel removed Evans from the car. As the emergency personnel were placing Evans in the ambulance, Haaga "asked them to ask her where her driver's license was, so [he] could obtain that, for the accident report." They said they would get back to him but did not. After the ambulance pulled away, Haaga observed a purse in the car. He also saw a woman's wallet next to—not in—the purse. It is his practice under these circumstances to collect anything of possible value from the car for safekeeping so it is not lost or stolen when, as in this case, the car will be towed to a "wrecker yard."

After entering the car to take custody of the purse and wallet, Sergeant Haaga looked through Evans' purse. When he did not find Evans' driver's license, he turned to the wallet. He opened a zippered compartment on the outside—what Haaga described as the "backside"—of the wallet. In the compartment he found "a small plastic baggie with the white crystal substance in it." He believed the substance was methamphetamine. He then opened the main part of the wallet and found Evans' driver's license. Haaga testified he was not investigating a crime at the time, he was just looking for the license.

Sergeant Haaga later took the purse and wallet to the sheriff's department and gave them to Deputy Longbine. Longbine explained the reason for taking Evans' purse was to obtain her driver's license number so the sheriff could determine "if she's suspended, or not suspended. It gives us her name. Her photo, also, gives us the information of knowing that is the person that was in the car." In addition, the sheriff's office uses the license number to determine whether the driver has a record or is required to have an interlock device on the car. Longbine said that at that time he was only investigating the accident, and it is necessary to obtain the driver's license to do paperwork for the accident. Longbine testified to testing the white crystals; they tested positive for methamphetamine.

4

Longbine explained he could not take the purse to Evans because there was not enough manpower for him to go to the hospital. But he no longer had the wallet. He explained:

"I gave it back to her—matter of fact, her boyfriend kept on calling and calling for it. And she—he—she wanted it. And I said I'm only going to take it and give it to her. And then when she got out of the hospital—she was still in her gown, and she was—it looked like she had her arm propped up. And that's when I went outside and handed it to her."

After hearing Deputy Longbine's and Sergeant Haaga's testimony, the district court judge ruled from the bench. The judge first noted Haaga conducted a search without a warrant. The judge then noted none of the exceptions to the warrant requirement applied. The judge acknowledged the "officer's situation . . . of investigating an accident, and—and wanting to take the shortcut." The judge observed that alternatives were available, such as impounding the automobile or getting a warrant if a search was justified. But "the opening of the wallet, and the opening of the zipper violate the defendant's constitutional rights." The judge granted Evans' motion to suppress.

The State moved to reconsider. The district court judge again ruled from the bench. The judge first distinguished the cases cited by the State. In doing so, the judge noted that the officers had the name of Julia Evans. And the court acknowledged that the purpose of the car search was for safekeeping of property. "He should be commended for that. He—that was what he should have done. He should have taken that into his custody, took for good and safe keeping." But the judge criticized the steps taken from that point. He noted "there's got to be a heightened sense of privacy in regards to a woman's purse." But the officer opened the purse and then the wallet. And "[i]nstead of popping open the wallet and looking in the middle where we would normally, where he found the driver's license, he opened a zip-locked side on the wallet and there he found the drugs." The

judge concluded: "There was no reason for this officer to search that purse, and then eventually search the wallet." The judge reaffirmed the previous ruling to suppress the evidence.

The State filed an interlocutory appeal. See K.S.A. 2017 Supp. 22-3603. We transferred the case from the Court of Appeals on our own motion under K.S.A. 20-3018(c).

ANALYSIS

Evans based her motion to suppress on the Fourth Amendment to the United States Constitution. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." This right extends to an individual's automobile and items in it, although "the interior of an automobile is not subject to the same expectations of privacy that exist with respect to one's home." *New York v. Class*, 475 U.S. 106, 114-15, 106 S. Ct. 960, 89 L. Ed. 2d 81 (1986).

Applying the Fourth Amendment, the United States Supreme Court has repeatedly held that the touchstone of any analysis is reasonableness. See *Cady v. Dombrowski*, 413 U.S. 433, 439, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973). And in construing the command for reasonableness, the Supreme Court has held "that 'except in certain carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant.'" 413 U.S. at 439 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528-29, 87 S. Ct. 1727, 18 L. Ed. 2d 930 [1967]). As we have noted: "'This "warrant requirement" espouses a marked preference for searches authorized by detached and neutral magistrates to ensure that searches "are not the random or arbitrary acts of government agents," but rather intrusions "authorized

6

by law" and "narrowly limited " in object and scope.'" *State v. Boggess*, 308 Kan. 821, 826, 425 P.3d 324 (2018).

If a warrant is not obtained, the government may seize property or conduct a search only if one of the "'specifically established and well-delineated exceptions'" to the warrant requirement applies. *Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009); see *Maryland v. Dyson*, 527 U.S. 465, 466, 119 S. Ct. 2013, 144 L. Ed. 2d 442 (1999). The most commonly recognized exceptions to the warrant requirement include consent, search incident to lawful arrest, stop and frisk, probable cause to search accompanied by exigent circumstances, the emergency doctrine, inventory searches, plain view, and administrative searches of closely regulated businesses. *State v. Ramirez*, 278 Kan. 402, 404-05, 100 P.3d 94 (2004). Of these common exceptions, the State, in its brief on appeal, has cited cases applying the plain-view and inventory exceptions, although it never clearly invokes the inventory exception. "If the State fails to meet its burden [of establishing these exceptions], the evidence seized is excluded." *State v. Canaan*, 265 Kan. 835, 840, 964 P.2d 681 (1998).

Sergeant Haaga's actions raise Fourth Amendment concerns at two steps, each of which must comply with the Fourth Amendment. First, he entered the automobile and seized Evans' purse and wallet. Second, he opened and searched the purse and wallet. We must consider these steps separately because the United States Supreme Court has explained that even though the seizure of a container within an automobile—such as a purse or wallet—may be justified under the Fourth Amendment, a container, if its contents are unknown, "may only be opened pursuant to either a search warrant . . . or one of the well-delineated exceptions to the warrant requirement." *Horton v. California*, 496 U.S. 128, 141, n.11, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990).

When we examine whether the State has met its burden of establishing a warrant exception at each of these steps, we apply a bifurcated standard of review. Under that bifurcated standard, we review the factual underpinnings of the district court's decision to determine whether they are supported by substantial competent evidence. *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015). Here, the parties do not argue about the district court's factual findings. Instead, they focus on the court's legal conclusion. Under our bifurcated standard of review, we review the district court's legal conclusion de novo. This means we give the district court's legal conclusion no deference. 301 Kan. at 461.

We apply this standard in the context of the State's argument about why it met its burden of establishing that the search and seizure of Evans' purse and wallet were justified under specifically established and well-delineated exceptions to the warrant requirement. The State has cited two lines of cases as authority for the warrantless seizure of the property and the search of the purse and wallet. One line includes *Cady v. Dombrowski*, 413 U.S. 433, and *South Dakota v. Opperman*, 428 U.S. 364, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976). These cases involved a seizure of property followed by search of an automobile. The second line of authority rests on this court's decision in *Canaan*, 265 Kan. 835. There, the court applied the well-established warrant exceptions of plain view and inventory searches. We hold the State has failed to establish that either line of cases justifies the search of Evans' purse and wallet.

Before turning to those cases, we pause to set aside a potential exception the State argues the district court inappropriately put in play by stating that the officers could have impounded the car or obtained a warrant. The State explicitly concedes that probable cause did not exist here and that neither Deputy Longbine nor Sergeant Haaga had a reason to investigate any sort of criminal activity or behavior. Evans agrees the officers lacked probable cause to justify a search and would not have had a basis for seeking a

8

warrant. While we think the State misinterprets the point the district court was making, we need not discuss the matter in detail because the parties agree the probable cause plus exigent circumstances exception to the warrant requirement does not apply here.

Focusing on what the State does argue, it asserts the district court's other errors arose because it "ignored the plain view situation as well as the provision pertaining to administrative caretaking function such as locating a driver's license to accurately complete an accident report." We begin with a discussion of the community caretaking function on which the State relies.

1. Dombrowski *and* Opperman *do not support the search of the purse and wallet.*

At oral argument, the State justified its reliance on the community caretaking theory by focusing its argument on *Cady v. Dombrowski*, 413 U.S. 433. In its brief, the State relied on *Opperman*, 428 U.S. 364. Neither case supports the search of Evans' purse and wallet.

In *Dombrowski*, Chester Dombrowski wrecked a car in a rural area. While officers investigated the accident, Dombrowski told them he was a Chicago police officer. The investigating officers believed that Chicago police were required to carry a police-issued service revolver at all times. Because Dombrowski had no gun on him, one of the officers looked for the gun in the front seat and in the glove compartment of the wrecked car while waiting for a private tow truck. He did not find the revolver.

When the tow truck arrived, the officers took Dombrowski to the hospital, where he fell into an unexplained coma. Subsequently, one of the officers drove to the private garage where the car had been towed. The car had been left outside and unguarded. The

9

officer began a more thorough search for the revolver, and in the process discovered evidence that led to Dombrowski being charged with and convicted of murder.

The question of whether the officer could conduct the warrantless search of the car at the garage reached the United States Supreme Court after Dombrowski filed post-conviction proceedings in federal court. He argued his conviction should be set aside because the trial court had not suppressed the evidence discovered in the car search in violation of his Fourth Amendment rights. The United States Supreme Court rejected Dombrowski's argument.

In doing so, the Court recognized the community caretaking function of local law enforcement officers when investigating automobile accidents "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Dombrowski*, 413 U.S. at 441. And the Court noted that, at times, such "noncriminal contact with automobiles will bring local officials in 'plain view' of evidence, fruits, or instrumentalities of a crime, or contraband." 413 U.S. at 442. The Court then discussed two factual considerations it felt important to its decision to uphold the constitutionality of the search.

First, the Court noted officers had seized the car because it "constituted a nuisance along the highway" and the driver was too "intoxicated (and later comatose)" to "make arrangements to have the vehicle towed and stored." 413 U.S. at 443. Thus, the police had seized the car for "safety." 413 U.S. at 443. The Court noted there was "no suggestion in the record that the officers' action in exercising control over it by having it towed away was unwarranted either in terms of state law or sound police procedure." *Dombrowski*, 413 U.S. at 445.

Here, the State compares the reasons for towing Evans' car to those in *Dombrowski*—safety. In response, Evans argues the police had no justification for impounding her car, which the State does not dispute. Then, she at least implies—and the facts support—that she was conscious and able to make decisions about her car. And she told Sergeant Haaga she did not want an ambulance and had called her ex-boyfriend. See *Canaan*, 265 Kan. at 844 ("When the owner, operator, or person in charge of a vehicle is capable and willing to instruct police officers as to the vehicle's disposition, then absent some other lawful reason for impounding the vehicle, the person should be consulted, and his or her wishes followed concerning the vehicle's disposition.").

But the record is unclear about whether she expressed her wishes about her car's disposition or was even aware of its condition. In fact, these issues and factual questions were not the focus of the arguments to the district court, and Evans did not ask the district court to make any factual findings about whether the State could tow her car. Thus, we do not reach any possible justifications for towing Evans' car. See *State v. Seward*, 289 Kan. 715, 720-21, 217 P.3d 443 (2009) (holding litigant who fails to object to inadequate findings and conclusions foreclosed from making appellate argument based on what is missing). Instead, we assume, without deciding, that the State appropriately towed Evans' car.

Next, Sergeant Haaga seized Evans' purse and wallet. In *Dombrowski*, the seizure of items in the car occurred because of concerns for public safety of leaving a firearm unguarded. That concern does not exist here. But the district court found the concerns for safekeeping of property were a legitimate basis for seizing the property, and Evans does not dispute this on appeal. In other words, that issue is also not before us. See *State v. Angelo*, 306 Kan. 232, 236, 392 P.3d 556 (2017).

11

Instead, Evans focuses on the lack of a Fourth Amendment justification for the search of her purse and wallet. In *Dombrowski*, the law enforcement officer's caretaking role was not, by itself, a basis for the Court to uphold the search. This brings us to the second factual point critical to the *Dombrowski* Court's analysis: "[T]he search of the trunk to retrieve the revolver was 'standard procedure in (that police) department,' to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." *Dombrowski*, 413 U.S. at 443. Likewise, the decision in *Opperman*, 428 U.S. 364, emphasized the need for standard procedures governing a search of property in law enforcement's custody.

*Opperman* established inventory searches of property seized by law enforcement officers can be reasonable if performed to: (1) protect an owner's property while in law enforcement hands, (2) protect law enforcement against claims or disputes over lost or stolen property, or (3) protect law enforcement from potential danger. 428 U.S. at 369. Each of these could be considered part of law enforcement's caretaking role. But the *Opperman* Court stressed that a valid purpose did not automatically mean the search complied with the Fourth Amendment. Instead, the inventory search must follow "standard police procedures." 428 U.S. at 376.

Thus, neither case allowed the search simply because law enforcement officers had some caretaking role or duty. Instead, officers had to conduct the search under a standard policy. A decision of the United States Supreme Court dealing with the search of a container found in a lawfully seized car, *Florida v. Wells*, 495 U.S. 1, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990), explains why the Court requires evidence of a standard policy that governs the search.

In *Wells*, after officers impounded a car, they conducted an inventory search that revealed a locked suitcase in the trunk. A law enforcement officer directed employees of

the impoundment facility to force open the suitcase, and officers found marijuana. Citing several of its past decisions, including *Opperman*, the Court noted that officers have discretion in conducting inventory searches "'so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" 495 U.S. at 3-4 (quoting *Colorado v. Bertine*, 479 U.S. 367, 375, 107 S. Ct. 738, 93 L. Ed. 2d 739 [1987]). The Court explained that requiring a standardized procedure before allowing containers to be opened during an inventory search prevented unrestrained rummaging by law enforcement officers:

> "Our view that standardized criteria . . . or established routine . . . must regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.' *Bertine*, 479 U.S. at 376 (Blackmun, J., concurring)." *Wells*, 495 U.S. at 4.

See *State v. Baker*, 306 Kan. 585, 590, 395 P.3d 422 (2017) (recognizing the need for standardized inventory requirements).

Applying this rule in *Wells*, the United States Supreme Court noted the law enforcement officers who had searched the car were not directed by any "policy what[so]ever with respect to the opening of closed containers encountered during an inventory search. We hold that absent such a policy, the instant search was not sufficiently regulated to satisfy the Fourth Amendment." *Wells*, 495 U.S. at 4-5; see *Baker*, 306 Kan. at 594 ("producing *no* evidence of a policy with respect to the opening of containers—as occurred here—does not pass constitutional muster").

13

Likewise, here, we have no evidence establishing the standard procedures of either the Abilene Police Department or the Dickinson County Sheriff's Office. Sergeant Haaga testified "there was a wrecker coming for [Evans' car], and *it's my practice*, when there's something of possible value in the car, I like to collect it for safekeeping, so it doesn't get lost, or stolen from the wrecker yard." (Emphasis added.) But an individual officer's practice does not meet the standard discussed in *Dombrowski*. He also did not speak to any policy about searching closed purses and zipped wallets once seized—a standard the *Wells* decision makes clear must exist for the search to be constitutional. In fact, the State has never argued that the search complies with the inventory search exception to the warrant requirement. Yet, as *Dombrowski*, *Opperman*, *Wells,* and other cases make clear, the caretaking role of law enforcement does not itself constitute an exception to the warrant requirement.

Without evidence of a standardized policy allowing the search, we hold the authority of *Dombrowski*, *Opperman*, and other related cases does not support the State's contention that the search of Evans' purse and wallet fits a well-delineated exception to the warrant requirement.

2. Canaan *and the completion of the accident report do not justify the search.*

The other case on which the State heavily relies is *Canaan*, 265 Kan. 835. The State argues *Canaan* justifies the search of Evans' purse and wallet because it recognizes an officer's statutory duty to complete an accident report. See K.S.A. 2017 Supp. 8-1611 and K.S.A. 8-1612. The State's arguments seem to suggest that a law enforcement officer's exercise of the statutory duty creates an exception to the warrant requirement. But the *Canaan* court relied on the plain view and inventory search exceptions to the warrant requirement—it did not create a new exception allowing a search simply because officers have a duty to complete the report.

14

As for the two exceptions applied by the *Canaan* court, we have already determined the State failed to meet its burden of establishing one—the inventory search exception. And, as we will discuss, the plain-view exception does apply under the facts here, which are distinguishable from those in *Canaan*. We begin our discussion of how *Canaan*'s facts affect the State's arguments.

In *Canaan*, law enforcement officers spotted the truck of a murder suspect. They began to follow the truck, and the suspect fled and eventually wrecked his truck. The officers found the suspect unconscious. After emergency personnel had opened the truck door and removed the suspect, officers began to investigate. An officer saw a gray wallet on the ground near the passenger door. He testified he removed the driver's license to identify the driver. The officer then noticed a black wallet on the floorboard of the truck. "[He] examined this wallet and found it contained the murder victim's driver's license." *Canaan*, 265 Kan. at 838. He then returned the wallet to the truck, sealed the truck, and began the process of obtaining a search warrant. The affidavit in support of the request for a warrant included the evidence of the victim's wallet, and the driver sought to suppress the evidence by arguing the officer had unlawfully obtained this evidence.

At the suppression hearing, the law enforcement officer testified:

> "'I wasn't sure who the driver of the vehicle was. I had a driver's license that said Marvin Canaan, but I didn't know if that was Marvin Canaan they had on the stretcher or not. So I retrieved the other wallet to see if I could get identification.'" 265 Kan. at 842.

The State argued that under those circumstances the officer conducted the search "to obtain information required by statute." *Canaan*, 265 Kan. at 843. And the court agreed the officer "had a duty to acquire information sufficient to investigate and report

on the accident." 265 Kan. at 843. The court based this conclusion on Kansas statutes requiring law enforcement officers to complete an accident report. The court held: "When [the law enforcement officer], while investigating the accident scene, opened the wallet and observed the victim's driver's license in the black wallet, the plain view doctrine applied." 265 Kan. at 843. That holding does not apply under the facts of this case or under current law.

Plain view means an officer sees an item from a lawful position or during a lawful search. "'What the "plain view" cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused.'" *Horton*, 496 U.S. at 135 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S. Ct. 2022, 29 L. Ed. 2d 564 [1971]). The Court added: "It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." 496 U.S. at 136. And "not only must the item be in plain view; its incriminating character must also be 'immediately apparent.'" 496 U.S. at 136 (quoting *Coolidge*, 403 U.S. at 466).

If those requirement are met, "the seizure of an object in plain view does not involve an intrusion on privacy." 496 U.S. at 141. In a footnote, the Court added: "Even if the item is a container, its seizure does not compromise the interest in preserving the privacy of its contents because it may only be opened pursuant to either a search warrant or one of the well-delineated exceptions to the warrant requirement. [Citations omitted.]" 496 U.S. at 141 n.11. Where a container is involved, complying with the warrant requirement or one of its well-delineated exceptions is required because "the Fourth Amendment provides protection to the owner of every container that conceals its contents

16

from plain view." *United States v. Ross*, 456 U.S. 798, 822-23, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982).

Here, Sergeant Haaga invaded Evans' privacy because her purse and her wallet concealed their contents from plain view. Thus, neither Evans' driver's license nor the methamphetamine and drug paraphernalia were in plain view before he began rummaging through the purse and wallet. If he violated the Fourth Amendment by searching, the fact the drugs and paraphernalia came into view does not matter. Thus, the question becomes whether his search of the purse and wallet was justified by one of the well-delineated exceptions to the warrant requirement.

The State cites none of the common exceptions to the warrant requirement to justify the search. Rather, it relies on Kansas statutes requiring an officer to complete an accident report—K.S.A. 2017 Supp. 8-1611 and K.S.A. 8-1612—a duty it categorizes as a community caretaking function. Yet, as we have discussed, neither *Dombrowski, Opperman*, nor any other United States Supreme Court decision that the parties have cited justifies a search in the absence of standards that control an officer's discretion. And no standards are mentioned in the record. Instead, the State relies on statutes that do not create a duty that warrants a search.

Under K.S.A. 2017 Supp. 8-1611,"[e]very law enforcement officer who:  (1) [i]nvestigates [an] accident of which a report must be made as required in this article; or (2) otherwise prepares a . . . report . . . either at the time of and at the scene of the accident or thereafter by interviewing the participants or witnesses" is required to send the report to the department of transportation "within 10 days after investigation of the accident." K.S.A. 2017 Supp. 8-1611(a). In addition, K.S.A. 8-1612(a) requires the department of transportation to prepare forms for written accident reports and requires, among other things, that the report must list "the persons and vehicles involved."

17

As the district court noted, the driver in *Canaan* was unconscious and the officers did not know who was in the ambulance, whereas here, Evans was conscious. She also disclosed her identity to the law enforcement officers and there was nothing—such as the presence of two wallets—to suggest confusion about her identity or to suggest she had given Sergeant Haaga inaccurate information. Thus, the law enforcement officers had the necessary information about the driver.

The officers testified they wanted the driver's license so they could, among other things, verify her identity. But the circumstances did not present an exigency or an emergency that required an immediate verification of Evans' identity or give rise to the emergency doctrine exception to the warrant requirement. Compare *United States v. Dunavan*, 485 F.2d 201 (6th Cir. 1973) (upholding search when driver was foaming at the mouth and unable to talk and officer was seeking information explaining nature of the defendant's condition and the best means of treating it), and *Evans v. State*, 364 So. 2d 93 (Fla. Dist. Ct. App. 1978) (holding officer lawfully searched purse for medical information that would account for driver's condition of being unable to communicate in any way), with *Morris v. State*, 908 P.2d 931 (Wyo. 1995) (holding search of effects not permissible when individual was conscious and able to ask and answer questions).

Additionally, K.S.A. 2017 Supp. 8-1611 and K.S.A. 8-1612 do not require immediate action. K.S.A. 2017 Supp. 8-1611(a)(2) specifically provides for interviews and additional investigation after the officer leaves the scene of the accident. And the only statutory deadline for completing an accident report allows the officer up to "10 days after investigation of the accident." K.S.A. 2017 Supp. 8-1611(a)(2). Significantly, the statutes recognize information may be unavailable. See K.S.A. 8-1612(b) (officer is to provide information requested by the accident report form "unless not available"). If Evans' driver's license had not been available by the end of the investigation, the officers

18

still could have completed their duty by submitting a report with the information they had available.

Through other statutes, the Kansas Legislature has indicated officers have some discretion in even asking to see a driver's license and, if asked, drivers do not have to immediately display their license. K.S.A. 2017 Supp. 8-1604 states that a driver involved in an accident must "give such driver's name, address and the registration number of the vehicle such driver is driving, *and upon request shall exhibit such driver's license*." (Emphasis added.) Here, the record does not establish that the officers asked Evans for her license or relayed such a request through, for example, hospital personnel or her ex-boyfriend. Even if one of the officers had asked Evans to display her license, the law allows some flexibility in the time for response. And, since the officers would not release Evans' possessions to anyone but her, they had the opportunity to ask her to produce her license when she came to retrieve her purse and wallet. While K.S.A. 8-244 required Evans to have her driver's license "in . . . her immediate possession" while operating a vehicle, she could not have been convicted of violating the statute if she "produce[d] in court or the office of the arresting officer a driver's license theretofore issued to such person and valid at the time" of the accident.

These Kansas statutes express a legislative intent that drivers have a reasonable time to produce their own driver's license. And the Legislature did not impose a duty on officers that would justify invading the privacy guaranteed by the Fourth Amendment when, as in this case, the driver is conscious and able to answer the officer's questions about her identity. See *People v. Wright*, 804 P.2d 866, 871 (Colo. 1991) (upholding suppression of evidence where "the officer was not confronted with a situation in which there was no other reasonable alternative other than to search the defendant's purse for the information necessary for a completed report"). The Legislature gave officers time after

19

an accident to investigate and even allowed for filing an incomplete report if information is unavailable.

Under the record presented to us, the officers did not have the right to intrude into Evans' purse and wallet. Simply put, the intrusion that afforded the plain view violated the Fourth Amendment.

CONCLUSION

The State has failed to meets its burden of establishing that the officer's search of Evans' purse and wallet was permitted under one of the specifically established and well-delineated exceptions to the warrant requirement. Thus, the search violated Evans' Fourth Amendment rights, and the evidence seized during the search must be suppressed. The judgment of the district court is affirmed. The case is remanded for further proceedings.