NOT DESIGNATED FOR PUBLICATION

No. 119,048

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

BECKY E. BUNCE,
*Appellant.*

MEMORANDUM OPINION

Appeal from Douglas District Court; SALLY D. POKORNY, judge. Opinion filed January 10, 2020. Reversed and remanded with directions.

*Kasper Schirer* and *Christina M. Kerls*, of Kansas Appellate Defender Office, for appellant.

*Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., PIERRON and STANDRIDGE, JJ.

SCHROEDER, J.: Becky E. Bunce was arrested for driving with a suspended license. After Bunce was arrested and placed in the police car, she observed the officer remove her purse from the pickup and asked the arresting officer to leave her purse in the truck she had been driving. Despite her request, the arresting officer removed Bunce's purse from the truck, searched it for weapons, and placed the purse back in the truck. Another officer called the truck's registered owner to pick up the truck and warned him there might be illegal contraband inside. The owner's wife, Nancy Potter, and one of her clients, Nicholina Chronister, came to get the truck. Chronister asked one of the officers for permission to search Bunce's purse, and she found methamphetamine and a pipe in a

sunglasses case. Bunce filed a motion to suppress this evidence. The district court denied the motion and convicted Bunce of possession of methamphetamine, possession of drug paraphernalia, and driving with a suspended license.

Bunce appeals, arguing the district court erred in denying her motion because the initial search was unlawful and the subsequent search by Chronister was "fruit of the poisonous tree." We reverse because the first officer's initial search and seizure of the purse was unlawful, and the second officer's suspicion there was something illegal in Bunce's purse was tainted by the initial illegal search and seizure of the purse. We also find the second officer's acquiescence to Chronister's later search of the purse as a private citizen renders the seizure of the evidence unlawful under the totality of the circumstances. We reverse and remand with directions.

FACTS

Around 10 p.m., three police officers—Gwyn Fogarty, Tracy Russell, and Sara Mills—responded to a report of a possible burglary at Potter Automotive in Lawrence. They found Bunce and a white truck in the parking lot. Bunce explained she was an employee of Potter Automotive and had permission to be there.

The officers ran Bunce's personal information through dispatch. Dispatch confirmed with Lynn Potter, the owner of Potter Automotive, that Bunce was an employee. The officers also learned Bunce did not have a valid driver's license. After confirming Bunce had permission to be there, the officers cleared the call and left the scene.

A few minutes later, Fogarty and Mills were talking while sitting in their individual patrol cars not far from Potter Automotive. They saw Bunce drive by in a white truck. Mills promptly pulled Bunce over and Fogarty arrived shortly after. Mills

2

arrested Bunce for driving while her driver's license was suspended. Mills removed a knife from Bunce's pocket and then handcuffed her. Bunce—still in handcuffs—was placed in Mills' patrol car, and Mills returned to the truck to secure it.

Looking in the truck, Mills saw Bunce's purse on the driver's side floor. She picked it up, opened the purse, and looked inside it for weapons. She then took it back to her patrol car. At that point, Bunce yelled she did not want her purse and Mills should put it back in the truck. Mills put Bunce's knife in the purse and returned the purse to the truck. Bunce claimed Mills told her, "[W]e know what's in your purse," when Mills returned to her patrol car. Mills then took Bunce to jail and left the scene under the control of Fogarty and Russell, who had arrived on the scene just after Mills placed Bunce under arrest.

Russell called Lynn Potter, the registered owner of the truck, about collecting it. Russell warned Lynn he should not come and get the truck himself because he had an outstanding warrant. So Lynn sent his wife, Nancy, and her client, Chronister, to get the truck. However, before taking the truck, Chronister asked permission of Russell to search Bunce's purse. Chronister found a sunglasses case with two small plastic baggies and a pipe inside, which she turned over to Russell. Field testing showed the baggies contained methamphetamine.

The State charged Bunce with possession of methamphetamine, possession of drug paraphernalia, and driving while suspended. Bunce filed a motion to suppress, challenging both Mills' and Chronister's searches of her purse. She argued Mills' warrantless search was unreasonable and anything later seized was tainted by her initial warrantless search. She also argued Chronister was acting as a government agent when she searched the purse.

3

The district court relied on testimony from the preliminary hearing, which occurred on three separate days over a four-month period, to decide the motion. At the preliminary hearing, Fogarty remembered Bunce asking for her purse to stay in the truck. She also recalled Mills saying she had seen what she believed was a narcotic drug kit in the purse when she placed Bunce's knife inside of it. Fogarty testified Mills thought she could do a search incident to a lawful arrest, but Russell and Fogarty agreed they could not. When Nancy arrived, Fogarty told her she would be responsible for anything illegal in the truck if she were driving it. Fogarty also testified she and Russell spoke to both Nancy and Chronister about taking possession of the vehicle and if there was anything illegal in the vehicle, they would be responsible for it.

Mills testified she did not look in the purse again after she briefly checked it for weapons and put the pocketknife back in it. She denied opening anything in the purse. Mills also did not recall seeing the sunglasses case. Instead, Mills claimed Bunce's behavior led her to believe the purse may have had narcotics in it, and she told Russell about her suspicion. Russell testified he also believed Bunce may have had narcotics in her purse because of her behavior. He explained detainees usually want to take personal items with them. He said he did not have any other information that would lead him to believe narcotics were in Bunce's purse. When Russell called Lynn about picking up the truck, he told Lynn the officers suspected Bunce's purse had something illegal inside of it. After Nancy and Chronister arrived at the scene, Chronister approached Russell. She told Russell she wanted to search the purse so she would not get in trouble for anything in it. Russell watched as Chronister searched the purse.

Chronister testified she spoke with Russell and "requested permission to search the contents of the purse, and if there was anything in it that I felt I would not want to be legally responsible for, that I could turn it over to them without being legally responsible for it." Russell agreed and offered Chronister his flashlight, which she used. Chronister

said she wanted to search the purse because she was "by nature a distrustful person." Chronister testified no one told her she or Nancy would be responsible for anything illegal in the truck. According to Chronister, Nancy told her Bunce wanted her purse to stay in the truck, but Nancy did not say the officers suspected narcotics were in it.

Nancy testified the officer who called her husband told them she could get in trouble for something in the truck if she picked it up. According to Nancy, she and Chronister discussed how they could both lose their jobs if they got in legal trouble. When they arrived, Nancy saw glasses and a phone sitting on top of the purse. She asked if she could take the glasses and phone and throw away the purse, but Russell said she could not. Russell told them they would be responsible for anything in the purse and then asked them if they would like to search it. Nancy also said she heard Russell direct Chronister to open the sunglasses case while Chronister was looking through the purse.

The district court did not make a finding about whether Mills' initial search of the purse for weapons was legal. Instead, it noted "if an officer without authority searches something and finds contraband and then just walks away, that is not an illegal search and seizure." The district court apparently declined to reach the merits of the issue because nothing was seized during the initial search. The district court also found Chronister was not acting as a government agent when she searched the purse. It found Chronister to be "very credible," noting she had no relationship with Bunce or the officers. Chronister specifically testified no one told her she would be responsible for anything in the purse. Similarly, no one suggested she should search the purse. The court concluded, "[T]here was just no evidence that [Chronister] was acting as an agent in any way for the government." As a result, the court denied Bunce's motion to suppress.

At a bench trial on stipulated facts, the district court found Bunce guilty of possession of methamphetamine, possession of drug paraphernalia, and driving with a

suspended license. The district court sentenced her to 13 months' imprisonment, suspended to 18 months' supervised probation.

ANALYSIS

On appeal, Bunce argues the district court erred in denying her motion to suppress. She argues Mills violated her rights under the Fourth Amendment to the United States Constitution and § 15 of the Bill of Rights of the Kansas Constitution when she searched Bunce's purse and allegedly saw the narcotics kit. She also argues Russell and Fogarty violated her Fourth Amendment rights because they used a private citizen to conduct a search and seizure they knew they could not perform and was illegal. We use a bifurcated standard when reviewing a district court's decision on a motion to suppress. We review the district court's factual findings to determine whether substantial competent evidence supports them. In reviewing the factual findings, we do not reweigh the evidence or assess the credibility of witnesses. We then review the ultimate legal conclusion using a de novo standard. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016).

*Mills' warrantless search and seizure of the purse requires suppression of the evidence.*

Bunce argues Mills' warrantless search of the purse and the actions that followed tainted the subsequent discovery of evidence during Chronister's search; thus, it should have been suppressed as "'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984); see *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). We agree based on the State's failure to: (1) argue or present evidence Mills' warrantless search of the purse and subsequent removal of the purse from the vehicle were lawful; and (2) argue or present evidence Mills' warrantless search and/or seizure of the purse did not taint Chronister's later search and discovery of the evidence.

6

The district court found:

"The first thing is even if this first search of the purse was an illegal search, there was no seizure. Now, if an officer without authority searches something and finds contraband and then just walks away, that is not an illegal search and seizure. I am not saying that I think there was an illegal search, but nothing was seized."

This finding is legally erroneous. A warrantless search is not made lawful because the officer did not seize evidence during the search, nor is the *later* seizure of evidence necessarily lawful simply because it was not seized during the *initial* unlawful search. See *Soldal v. Cook County*, 506 U.S. 56, 69, 113 S. Ct. 538, 121 L. Ed. 2d 450 (1992); *Murray v. United States*, 487 U.S. 533, 541-44, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988). In reviewing the district court's decision on this issue, we give no deference to its legal conclusions. And we need not remand for consideration of a point subject to unlimited review. See *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

The reason for an officer's search or seizure "is wholly irrelevant to the threshold question [of] whether the [Fourth] Amendment applies." *Soldal*, 506 U.S. at 69. "As [the United States Supreme Court has] observed on more than one occasion, it would be 'anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.'" 506 U.S. at 69 (quoting *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 530, 87 S. Ct. 1727, 18 L. Ed. 2d 930 [1967]). The Fourth Amendment "protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all." *Katz v. United States*, 389 U.S. 347, 350, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); see *Texas v. Brown*, 460 U.S. 730, 739, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983) (Fourth Amendment prohibition against warrantless seizures protects possessory and ownership interests in property).

"A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *State v. Jones*, 279 Kan. 71, 75-76, 106 P.3d 1 (2005) (citing *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 [1984]). With respect to searches, "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. [Citations omitted.]" *Katz*, 389 U.S. at 351. A person has a legitimate expectation of privacy under the Fourth Amendment when: (1) the person expresses an actual subjective expectation of privacy; and (2) the expectation is objectively reasonable. See *Katz*, 389 U.S. at 361 (Harlan, J., concurring).

1.  *The contents of Bunce's purse were subject to Fourth Amendment protections.*

Here, Bunce demonstrated a subjective expectation of privacy in the contents of her purse. Bunce's express objection to the officers searching her purse, along with the fact it was not open, demonstrates an actual subjective expectation of privacy. She explicitly told Fogarty she did not want the officers to search her purse or remove it from the vehicle. She also told Mills she did not want her purse removed from the truck after she saw the purse in Mills' possession. Bunce did not give Mills permission to search or remove the purse when Mills and Bunce discussed Mills' plan to secure the truck. Additionally, the contents of Bunce's purse were not knowingly exposed to public view. Mills testified the purse was at least partially closed and she had to open it to see inside. The State introduced a photo of the purse into evidence during the officers' testimony. The photo shows the purse was made from nontransparent material; therefore, its contents could not be seen unless it was opened. This exhibit was attached to Bunce's motion to suppress and referred to during arguments on the motion. This objective

8

evidence is obvious on the face of the record and requires no findings or interpretation by the trier of fact.

Bunce's subjective expectation of privacy was objectively reasonable. In guarding against unwarranted governmental intrusions, the Fourth Amendment protects individual privacy interests in "'intimate' details" concealed within the place or thing searched. *Kyllo v. United States*, 533 U.S. 27, 39, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001). The contents of a woman's purse could reveal any number of intimate details in which she has a legitimate expectation of privacy, such as medical or financial information, or religious, familial, professional, personal, or political associations. See *Carpenter v. United States*, 585 U.S. ___, 138 S. Ct. 2206, 2217, 201 L. Ed. 2d 507 (2018). And our Supreme Court has clearly recognized the protections of the Fourth Amendment extend to the contents of a woman's purse. See *State v. Evans*, 308 Kan. 1422, 1426-27, 430 P.3d 1 (2018). Because Mills' search of the purse infringed upon Bunce's objectively reasonable expectation of privacy, it was a search within the meaning of the Fourth Amendment. See *Jones*, 279 Kan. at 75-76.

2. *Mills' search of the purse was unlawful*.

The district court did not make a finding whether Mills' search of the purse was lawful. Nevertheless, the relevant facts are not in dispute; thus, we need not remand for the district court to consider this question because it is a pure question of law. Our standard of review is unlimited. See *Hanke*, 307 Kan. at 827. There is no dispute Mills searched Bunce's purse. Mills testified she unzipped the purse, moved objects in the purse around with her hand, and visually examined it for weapons. Bunce told Mills she did not want her purse removed from the truck after she saw the purse in Mills' possession. Whether Mills was looking for contraband is irrelevant; she still searched the purse. See *Jones*, 279 Kan. at 75-76.

9

It is also undisputed that Mills did not have a warrant to search the purse. The Fourth Amendment prohibits unreasonable searches and seizures by requiring law enforcement officers who conduct a search to have either a warrant or a basis for relying on one of the specific and well-recognized exceptions to the warrant requirement. Warrantless searches and seizures are presumptively unreasonable. See *Riley v. California*, 573 U.S. 373, 381-82, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014); *State v. Hubbard*, 309 Kan. 22, 33, 430 P.3d 956 (2018). On a motion to suppress evidence, the State bears the burden of proving the lawfulness of a warrantless search. This requires the State to argue a valid exception to the warrant requirement applies and prove by a preponderance of the evidence the officer's warrantless search fits within the exception. See *Evans*, 308 Kan. at 1426-27; *State v. Porting*, 281 Kan. 320, 324, 327-28, 130 P.3d 1173 (2006).

A. *The State did not argue a valid basis for the search.*

The State's written response to Bunce's motion to suppress did not address the legality of Mills' *initial* search of the purse; rather, the State only addressed whether Chronister was acting as a government agent when she *later* searched the purse. At oral argument on the motion to suppress, the State acknowledged Mills searched the purse for weapons but argued "[t]hat doesn't mean [Mills] conducted an illegal search." But the State did not argue a recognized exception to the warrant requirement. The State further asserted "nothing was seized by Officer Mills. So even if there was an illegal search by Officer Mills, there are no fruits of that search . . . to be suppressed." This argument has no bearing on the legality of the initial search, nor does it establish the legality of the subsequent seizure of evidence. See *Murray*, 487 U.S. at 541-44.

There is some discrepancy between Mills' and Fogarty's testimony about what, if anything, Mills' search of the purse may have uncovered. According to Fogarty, Mills told Fogarty and Russell she saw a drug kit in the purse. Mills stated she searched the

10

purse for weapons because she wanted to bring the purse to the jail and "make sure it didn't have any like obvious guns or something that the jail was going to be mad at me for bringing out." The district court did not resolve this inconsistency. But in either scenario, Mills' search was unlawful. The purpose of the search and whether anything was seized is irrelevant to the legality of the search itself. See *Kyllo*, 533 U.S. at 39; *Soldal*, 506 U.S. at 69; *Murray*, 487 U.S. at 541-44; *Jones*, 279 Kan. at 75-76. We need not remand for a factual finding on this point because it is irrelevant to the pure question of law presented. See *Hanke*, 307 Kan. at 827.

Given the State's failure to argue any recognized legal basis for Mills' warrantless search or to present evidence in support thereof, we need not remand for additional findings of fact or conclusions of law. The State has the burden to justify a warrantless search. It must argue a recognized exception to the warrant requirement and must sufficiently, i.e., *affirmatively* prove the exception applies *with evidence*. In determining whether the State met this burden, a court cannot draw inferences in favor of the State based on a *lack* of contrary evidence. See *Porting*, 281 Kan. at 324, 327-28. The *relevant* facts in the record before us are not in dispute. Thus, we are presented with a pure question of law subject to unlimited review. See *Hanke*, 307 Kan. at 827.

While we otherwise might decline to consider whether any exception applies, the legality of Mills' *initial* search is ultimately a threshold question to Bunce's contention Mills' actions tainted the fruits of Chronister's *later* search. When the State fails to meet its burden to establish the lawfulness of a challenged search or seizure, any derivative evidence obtained from the illegal search or seizure must be suppressed under the exclusionary rule. See *State v. McGinnis*, 290 Kan. 547, 551, 233 P.3d 246 (2010). "The fruit of the poisonous tree doctrine is 'one facet of the exclusionary rule' and 'extend[s] the scope of the exclusionary rule to bar' admission of evidence directly or indirectly obtained as a result of unlawful police conduct. *State v. Deffenbaugh*, 216 Kan. 593, 598, 533 P.2d 1328 (1975)." *State v. Jefferson*, 297 Kan. 1151, 1161-62, 310 P.3d 331 (2013).

11

Thus, we will consider the legality of Mills' initial search of the purse. But we will not remand for further consideration on a point the State neither argued nor attempted to prove before the district court and has not addressed on appeal. See *State v. Sanders*, 310 Kan. 279, 302-03, 445 P.3d 1144 (2019); cf. *State v. Declerck*, 49 Kan. App. 2d 908, 922-23, 317 P.3d 794 (2014).

### B. *No valid warrant exception applies*.

"The most commonly recognized exceptions to the warrant requirement include consent, search incident to lawful arrest, stop and frisk, probable cause to search accompanied by exigent circumstances, the emergency doctrine, inventory searches, plain view, and administrative searches of closely regulated businesses." *Evans*, 308 Kan. at 1426-27. The record shows no valid warrant exception applies. Mills' testimony reflects she had to unzip the purse and reach inside to examine its contents; therefore, this was not a plain view search. This was not a stop and frisk, administrative search of a closely regulated business, or an emergency search.

This was not a search incident to lawful arrest. "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Arizona v. Gant*, 556 U.S. 332, 351, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009). Bunce was handcuffed in the back of Mills' patrol car with Fogarty standing nearby; she was not within reaching distance of the passenger compartment at the time of the search. And the crime of arrest—driving with a suspended license—is not something Mills could expect to find evidence of in Bunce's purse. See *Gant*, 556 U.S. at 344. Further, "a search incident to arrest may only include 'the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible

12

evidence.'" *Gant*, 556 U.S. at 339 (quoting *Chimel v. California*, 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L. Ed. 2d 685 [1969]).

> "That limitation, which continues to define the boundaries of the exception, ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy. . . . If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." *Gant*, 556 U.S. at 339.

Because Bunce was secured in the back of Mills' patrol car there was no possibility she could access the purse to gain possession of a weapon or destroy evidence. Notwithstanding any other potential illegalities with the search, regardless of whether Mills was searching for contraband or weapons, no justification for search incident to valid arrest was met or argued by the State. See *Gant*, 556 U.S. at 339. Clearly the crime of arrest—driving with a suspended license—a fact Mills knew from her earlier contact with Bunce—has no relation to weapons or drugs. Mills was not justified in searching the purse for contraband or weapons. See *Gant*, 556 U.S. at 351.

There was no valid consent by Bunce. Bunce did not consent to Mills searching her purse or removing it from the truck. This fact is uncontested. Bunce initially asked Mills to secure the vehicle and retrieve her cell phone. But she withdrew her request *before* Mills removed the purse from the truck and searched it. Because Bunce did not consent to Mills' actions, Mills did not have valid consent to search or remove *any* of Bunce's property from the vehicle. The State has the burden of establishing the scope and voluntariness of the consent to search. *State v. James*, 301 Kan. 898, 909, 349 P.3d 457 (2015). To establish valid consent, the State must prove:  (1) clear and positive testimony that consent was unequivocal, specific, and freely given; and (2) the absence of duress or

13

coercion, express or implied. *State v. Cleverly*, 305 Kan. 598, 613, 385 P.3d 512 (2016). Here, the State did not argue Bunce consented to the search of her purse, nor did the State prove consent was unequivocally, specifically, and freely given. In fact, consent to remove or search the purse was expressly denied.

Next, we consider whether there was probable cause plus exigent circumstances to justify the search. The State failed to argue or establish probable cause plus exigent circumstances. The automobile exception is a subset of the probable cause plus exigent circumstances exception to the warrant requirement. Probable cause is a practical, common-sense decision about whether a crime has been committed and whether there is a fair probability contraband or evidence of a crime will be found in a particular place. *State v. Mullen*, 304 Kan. 347, 353, 371 P.3d 905 (2016). Under the automobile exception, an officer must have probable cause to believe evidence of a crime will be found in the vehicle. The mobility of the vehicle provides the exigent circumstances without the necessity of proving anything more. See *State v. Howard*, 305 Kan. 984, 990, 389 P.3d 1280 (2017). Here, however, Mills did not claim she had probable cause to believe some other crime had been committed and evidence of that crime would be found in the vehicle. Thus, she had no basis to search the purse under the automobile exception.

The only exception Mills' testimony came even somewhat close to invoking— although the State did not argue the point—is a preincarceration inventory search. However, to prove the search was a lawful inventory search, the State must present evidence the search was conducted pursuant to a standardized department policy. See *Evans*, 308 Kan. at 1432-33. Mills testified she wanted to make sure there were no weapons in the purse "the jail was going to be mad at [her] for bringing." This does not demonstrate the existence of an established department policy to (1) remove the purse from the vehicle to bring to the jail, or (2) search the purse for weapons prior to taking it to the jail. The State did not allege or prove this was a proper inventory search. See 308 Kan. at 1433. Moreover, simply asserting—as the State did here—that the officer was

14

looking through the property prior to taking the suspect to jail is not a proper argument under the inventory search exception. See *Sanders*, 310 Kan. at 302-03.

The State failed to justify Mills' warrantless search of Bunce's purse. When the State fails to meet its burden to establish the lawfulness of a challenged search or seizure, any evidence obtained through exploitation of the illegal search or seizure is subject to suppression through application of the exclusionary rule. See *McGinnis*, 290 Kan. at 551. "[T]here are exceptions to the exclusionary rule," but the State bears the burden to establish those exceptions. *Jefferson*, 297 Kan. at 1162. But before we discuss this point, we must consider what Mills did with the purse *after* she searched it, regardless of whether she saw a drug kit *during* the search.

The State argued and the district court agreed it was not improper for the officers to base their suspicions on the fact Bunce became upset when Mills removed her purse from the vehicle. As further explained herein, Fogarty's testimony that Mills said she saw a drug kit is problematic given the State's burden to (1) prove the legality of the initial search, or (2) failing to establish the initial search was lawful, prove an exception to the exclusionary rule applies. However, we must also consider whether a warrantless seizure of the purse itself tainted the subsequent seizure of the evidence. See *Jefferson*, 297 Kan. at 1161-62; cf. *State v. Thompson*, 284 Kan. 763, 772, 166 P.3d 1015 (2007).

   3.   *The purse was unlawfully seized*.

Mills and Russell generally asserted their suspicions were based largely on Bunce's reaction to Mills removing the purse from the truck. While this may seem to be a more innocuous basis for the officers' suspicions than Mills finding a drug kit in the purse, a warrantless seizure of property may nonetheless taint the evidence subsequently obtained. See *Jefferson*, 297 Kan. at 1161-62. The Fourth Amendment's protections extend to warrantless seizures of a person's effects, i.e., tangible personal property. When

15

an officer seizes a person, the officer incidentally seizes those effects the person has in his or her possession at the time of the seizure. This incidental seizure of the person's effects does not violate the Fourth Amendment provided the officer had a lawful basis for seizing the person. However, when an officer separately seizes a person's effects in the course of the encounter, that seizure must have a proper, individual justification under the Fourth Amendment. See *United States v. Place*, 462 U.S. 696, 715-16, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983) (Brennan, J., concurring); *Brown*, 460 U.S. at 737-38; *Payton v. New York*, 445 U.S. 573, 586-87, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980).

Objects in plain view are not subject to the privacy interests protected by the Fourth Amendment. However, the owner still retains his or her possessory and ownership interests in the object. Those interests are protected by the Fourth Amendment's prohibition against unreasonable seizures of effects. See *Brown*, 460 U.S. at 737-39. But "'plain view' provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment." 460 U.S. at 738. "'Plain view' is perhaps better understood, therefore, not as an independent 'exception' to the warrant clause, but simply as an extension of whatever the prior justification for an officer's 'access to an object' may be." 460 U.S. at 738-39. "The question [of] whether property in plain view of the police may be seized therefore must turn on the legality of the intrusion that enables them to perceive and physically seize the property in question." 460 U.S. at 737.

Here, Mills had a lawful basis for seizing Bunce's person. Mills had just learned Bunce's driver's license was suspended at Potter's shop; therefore, she had reasonable suspicion to stop Bunce when she saw her driving the truck a few minutes later. And Mills had probable cause to arrest Bunce based on the fact she was driving the truck while her license was suspended. See K.S.A. 2018 Supp. 8-262(a)(1); K.S.A. 22-2401(d). Thus, there is nothing unlawful about the incidental seizure of the vehicle and its contents based on the initial stop. Stopping Bunce gave Mills a lawful vantage point to see items

16

in plain view within the truck, including Bunce's purse. Bunce's discussion with Mills about securing the truck gave Mills certain limited authority to do the same, i.e., turn off the truck, remove the keys, roll up the windows, and close and lock the doors. Thus, Mills had a lawful basis to *see* the purse and enter the place it was located—the cab of the truck. See 460 U.S. at 737-39.

But as we have already discussed, Mills did not have a lawful basis to *search* the purse. Moreover, Mills did not have a lawful basis to remove the purse from the truck, which is further problematic for the State. This is because Mills taking the purse was a seizure; it caused some meaningful interference with Bunce's possessory interests in her purse. See *Jones*, 279 Kan. at 75-76. And "seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place." *Soldal*, 506 U.S. at 68. "While the concept of a 'seizure' of property is not much discussed in [United States Supreme Court] cases, this definition follows from [the Court's] oft-repeated definition of the 'seizure' of a person within the meaning of the Fourth Amendment—meaningful interference, however brief, with an individual's freedom of movement." *Jacobsen*, 466 U.S. at 113 n.5.

Whether the interference is "meaningful" depends on the circumstances under which an officer takes the property. When luggage or packages are briefly detained while in the custody of a common carrier, it generally does not constitute a seizure within the meaning of the Fourth Amendment. See *United States v. Van Leeuwen*, 397 U.S. 249, 252, 90 S. Ct. 1029, 25 L. Ed. 2d 282 (1970); *United States v. Va Lerie*, 424 F.3d 694, 706-07 (8th Cir. 2005). However, when luggage is taken directly from a passenger or when personal property is removed from a vehicle, the interference rises to the level of a seizure. See *Place*, 462 U.S. at 704-06; *Brown*, 460 U.S. at 739. Here, Bunce's purse was removed from a vehicle, which she had valid permission to use. This constitutes a seizure within the meaning of the Fourth Amendment. Accordingly, Mills was required to have a valid Fourth Amendment justification for the warrantless seizure of the purse. See *Brown*,

17

460 U.S. at 737-39. It makes no difference why Mills seized the purse; the warrantless seizure itself—not the subjective purpose of the seizure—triggers the application of the Fourth Amendment. See *Soldal*, 506 U.S. at 68-69.

The purse itself was not a weapon or contraband and it was located in a private vehicle, not a public place; there was no presumptively reasonable basis for Mills to seize the purse. See *Payton*, 445 U.S. at 586-87. Even though Mills had a lawful vantage point to see the purse and lawful access to the cab of the truck, the purse itself had no inherent or immediately apparent incriminatory character. Thus, Mills had no basis to seize the purse based on probable cause of criminal activity when she removed it from the truck. See *Brown*, 460 U.S. at 741-42.

According to Mills, her suspicions about the contents of the purse were based on Bunce's reaction *after* she removed it from the truck. But Mills never claimed to have reasonable suspicion to justify temporarily seizing the purse for some lawful investigatory purpose, even after Bunce's reaction. Prior to removing the purse from the vehicle, Mills claimed she had no reason to believe Bunce had committed any crime other than driving while suspended. Mills generally denied having any recollection of seeing anything incriminating in her search of the purse, although if she affirmatively claimed to have seen something, that would create an additional complication. Mills had no lawful investigatory purpose for taking the purse and could not remove it from the truck just to see how Bunce would react. See *Place*, 462 U.S. at 703-09 (officers must have a proper governmental interest and reasonable suspicion of criminal activity in order to briefly seize property for purposes of additional investigation short of an actual search); *Jefferson*, 297 Kan. at 1161-62 (officers may not exploit an unlawful seizure of property in order to obtain derivative evidence); cf. *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (warrantless seizure executed in the hope something might turn up during the course of the stop is purposeful and flagrant police misconduct).

18

Mills' only lawful justification for removing the purse was to take it for the jail to hold with Bunce's personal property. Bunce had not asked Mills to do this, and she had not consented to Mills taking her purse. Mills took the purse from the truck and placed it on the hood of her patrol car; she was not bringing it to Bunce. Mills was exercising dominion and control over the purse for the purpose of turning it over to third-party government actors who were unknown to Bunce, without any request or permission to do so. Bunce left her purse in the truck when Mills stopped her. She did not abandon it in a public place, nor did she demonstrate an intent to bring the purse with her. Bunce told Mills she wanted someone named Chris Green to retrieve the truck and her personal effects. Mills said she could not turn the truck over to Green, but the officers would contact the truck's owners—Bunce's employers, the Potters—to determine what they wanted done with the truck. Mills and Bunce then discussed securing the truck, which did not include removing Bunce's purse. There was no evidence presented the Potters or Bunce had any objection to Bunce's property remaining in the truck.

Mills' justification for taking the purse to the jail essentially arose apropos of nothing—except perhaps her warrantless search of the purse—in the course of securing the truck. Regardless of Mills' subjective intent—benevolent or otherwise—she still needed a valid justification for seizing the purse. See *Soldal*, 506 U.S. at 68-69. Bunce did not ask Mills to retrieve her purse; thus, there was no consent to the seizure. There was no evidence presented that Mills was acting pursuant to standardized department policy in collecting Bunce's property from the vehicle. The State failed to prove the seizure of Bunce's purse was lawful. Accordingly, the State must prove the warrantless seizure did not taint the fruits of the subsequent search. See *Jefferson*, 297 Kan. at 1161-62.

4. *The State failed to prove an exception to the exclusionary rule.*

When the State fails to meet its burden to establish the lawfulness of a challenged search or seizure, any evidence obtained through exploitation of the illegal search or seizure is subject to suppression through application of the exclusionary rule. See *McGinnis*, 290 Kan. at 551. "[T]here are exceptions to the exclusionary rule," but the State bears the burden to establish those exceptions. *Jefferson*, 297 Kan. at 1162. Generally, those include the attenuation doctrine, the independent source doctrine, and the inevitable discovery doctrine. See *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016). To avoid application of the exclusionary rule, the State needed to prove Mills' unlawful search and seizure of Bunce's purse did not taint Chronister's subsequent discovery of evidence. See *Jefferson*, 297 Kan. at 1161-62.

It is not clear which exceptions, if any, the State argued or attempted to argue before the district court. In its brief, the State asserts "Chronister independently discovered the drug evidence without any knowledge of Mills' observations. . . . Even if Mills spotted a narcotic kit and shared that information with Fogarty and Russell, it did not influence the ultimate collection of [evidence] by an unrelated third party." Again, it is not entirely clear which exceptions the State may be arguing; however, it seems to suggest either the attenuation or independent source doctrine.

It appears the district court found some exception to the exclusionary rule applied based on the fact Chronister, not the officers, ultimately removed the drug kit from Bunce's purse. But the district court did not indicate whether it found Chronister's search was an independent source of the evidence or constituted sufficient intervening circumstances to attenuate the taint of Mills' warrantless initial search and seizure. In any event, the district court's reasoning is flawed; none of the recognized exceptions apply.

20

## A. *Inevitable discovery does not apply*.

The inevitable discovery exception to the exclusionary rule "'allows for the admission of evidence that would have been discovered even without the unconstitutional source,' because 'punishment for an act that does no harm is not required in order to deter harmful acts.'" *State v. Baker*, 306 Kan. 585, 591, 395 P.3d 422 (2017) (quoting *Strieff*, 136 S. Ct. at 2059; *State v. Ackward*, 281 Kan. 2, 128 P.3d 382 [2006]). The State must prove by a preponderance of the evidence that unlawfully obtained evidence ultimately or inevitably would have been lawfully discovered. *Baker*, 306 Kan. at 591.

This often occurs when evidence is obtained in a search of a vehicle that is subsequently impounded and, therefore, subject to a lawful inventory search, or when evidence ultimately subject to a preincarceration inventory search is or would have been obtained pursuant to standardized department policy allowing the search. See *Evans*, 308 Kan. at 1433; *Baker*, 306 Kan. at 594. This can also occur when the State proves:  (1) the officers had *lawful* access to other evidence; (2) that evidence alone would have led the officers to seek a valid search warrant; and (3) the lawful evidence itself would have been sufficient for the officers to obtain a valid search warrant. See *State v. Carr*, 54 Kan. App. 2d 780, 793-94, 406 P.3d 403 (2017), *rev. denied* 307 Kan. 989 (2018).

Here, the State failed to argue and the record does not show the officers would have sought and obtained a warrant to search Bunce's purse based on other lawfully obtained evidence. The vehicle was not impounded because Russell called the lawful owner, Lynn Potter, who arranged for it to be picked up by his wife, Nancy. The evidence would not have been inevitably discovered in an inventory search of the vehicle because the vehicle was not impounded. Moreover, the officers could not have impounded the vehicle because they were able to contact Lynn and he made arrangements to retrieve the vehicle. See *State v. Canaan*, 265 Kan. 835, 844, 964 P.2d 681 (1998).

Ultimately, Bunce's purse was not taken to the jail and was not subject to a preincarceration inventory search. But even if it had been, the State failed to present evidence of any standardized department policy for the search of the purse much less that under such policy, Bunce's sunglasses case would have been opened during a preincarceration inventory search of her purse. And the State never made a clear argument under the inevitable discovery doctrine before the district court, nor did it discuss an exception for an inventory search of the vehicle or Bunce's purse. See *Sanders*, 310 Kan. at 302-03 (failure to properly argue or support inevitable discovery argument based on a subsequent inventory search before the district court resulted in waiver of the issue); *Evans*, 308 Kan. at 1433 (failure to present evidence of standardized department policy allowing inventory search of purse was fatal to the State's argument); *Baker*, 306 Kan. at 594 ("[P]roducing *no* evidence of a policy with respect to the opening of containers—as occurred here—does not pass constitutional muster.").

Finally, the evidence does not establish Chronister would have inevitably searched the purse. Chronister knew the truck belonged to Lynn, but she also knew Bunce's purse was in the truck before she arrived. Chronister's knowledge Bunce's purse was in the vehicle came from what Russell relayed to the Potters. In other words, Chronister only knew to ask to search the purse because she knew it was in the vehicle. The district court found Chronister's testimony credible that she was a naturally suspicious person and had not been told the officers suspected there was anything illegal in Bunce's purse. The district court further found Chronister would have searched the purse regardless of whether she had been told the officers suspected there was something illegal in the purse. But the district court's factual and credibility findings do not answer the pertinent question.

Chronister asked Russell's permission before searching the purse. Chronister had not taken possession of the vehicle at the time she searched the purse; thus, she did not have control over the vehicle or its contents. Chronister's purpose for the search was to

22

make sure there was nothing illegal in the vehicle *before* she took possession. But in obtaining permission from Russell to search, Russell also agreed Chronister could give him "anything . . . [she] felt [she] would not want to be legally responsible for." It was not inevitable Chronister would search the purse because she only did so after Russell said she could. Similarly, it was not inevitable Chronister would have done so if Russell had denied her request because Chronister was unwilling to take possession of the vehicle without first making sure there was nothing inside that she "would not want to be legally responsible for."

It was also not inevitable Chronister would have searched the purse without Russell agreeing to take anything Chronister did "not want to be legally responsible for . . . without [Chronister] being legally responsible for it" because it would have defeated Chronister's express purpose for the search. Chronister wanted to search the purse before taking the vehicle because she was "by nature a distrustful person." But she did not have a specific basis to believe there was anything illegal in the purse. If Chronister searched the purse and discovered something illegal but the officers would not take it, she would have had *actual knowledge* of something illegal in the vehicle but not the requested means to legally dispose of it. Inevitable discovery does not apply.

## B. *The Independent Source Doctrine does not apply.*

To prevent the application of the exclusionary rule based on an independent source, the source from which the evidence is ultimately obtained must be "wholly unconnected" to the initial illegality. *Segura*, 468 U.S. at 814. Here, Chronister's search of the purse is not wholly unconnected to Mills' unlawful search and/or seizure of the purse. Mills' suspicion about what was in the purse was based on either seeing a drug kit during the unlawful search of the purse or Bunce's reaction to Mills' subsequent unlawful seizure of the purse. Russell's suspicions were based on what Mills told him. According to Fogarty, Mills told Russell and Fogarty she saw a drug kit when she searched the

23

purse. Mills' and Russell's testimony does not directly contradict Fogarty's testimony on this point.

To the extent there was any contradiction or inconsistency, the State did not expressly ask Mills or Russell about the conversation Fogarty described. This is troubling because Fogarty was the State's first witness. And the parties agreed to waive any hearsay objections to subsequent questions to Mills and Russell regarding statements from Fogarty. Moreover, when Bunce filed her motion to suppress, she had obtained transcripts of all three officers' testimony from the trifurcated preliminary hearing and specifically cited Fogarty's statement that Mills told her and Russell she saw a drug kit in the purse. The State did not address this point in its written response or at oral argument on the motion. The State did not ask the district court to resolve any perceived conflicts in the evidence nor did it call Mills or Russell to testify at the suppression hearing to rebut Fogarty's statement. The State did not call any witnesses and did not object to the district court deciding the suppression motion based on the officers' preliminary hearing testimony. And the State did not ask for nor did the district court make a credibility finding on Fogarty's preliminary hearing testimony.

To the extent Mills' testimony conflicted with Fogarty's, Mills said she did not recall seeing anything illegal in the purse. However, for our purposes we do not need to resolve this conflict as the State has the burden to prove the legality of the initial search or, failing to do so, prove an exception to the exclusionary rule. The State must meet this burden *with evidence*. A reviewing court cannot draw inferences in favor of the State based on a lack of evidence in the record. Doing so impermissibly shifts the State's burden of proof to the defendant. See *Jefferson*, 297 Kan. at 1162; *Porting*, 281 Kan. at 327-28. The only affirmative evidence in the record demonstrates Mills' suspicions were based at least in part on the unlawful seizure and search of the purse.

24

Russell testified his suspicions were based on his discussions with Mills and Fogarty. Like Mills, Russell never expressly denied the conversation Fogarty described. But at a minimum, Russell's suspicions were based on his discussions with Mills, which included Bunce's reaction to Mills removing the purse from the truck. We observe no conflict between the three officers' testimony that their suspicions were, to some degree, based on Bunce's reaction. Thus, the evidence undisputedly shows the officers' suspicions were based on Mills' unlawful seizure of the purse, and the State failed to meet its burden to prove the officers' suspicions were not also based on Mills' unlawful search.

Russell contacted Lynn and told him Bunce's purse was in the truck and he suspected there was something illegal in the purse. Chronister learned Bunce's purse was in the vehicle based on what Russell told Lynn and/or Nancy. Chronister then asked Russell for permission to search the purse and asked if he would take anything she found that she did "not want to be legally responsible for," i.e., contraband; Russell agreed. In short, Russell permitted a search of the same object—the purse—for the same thing— contraband—he already suspected was there based on Mills' illegal search and/or seizure. And he agreed to and seized the items Chronister recovered in the search. The State failed to show Chronister's search was wholly unconnected to the initial illegality of Mills' search and seizure; thus, it is not an independent source. See *Segura*, 468 U.S. at 814.

> C. *The State failed to prove the taint of the unlawful search and seizure of the purse was sufficiently attenuated.*

Under the attenuation doctrine, a court may admit evidence obtained as a result of an unlawful search or seizure, i.e., official misconduct, if the connection between the unconstitutional police conduct and the discovery of the evidence is remote or has been sufficiently interrupted by an intervening circumstance as long as the police did not commit the misconduct purposefully or flagrantly. See *Strieff*, 136 S. Ct. at 2061-64. In considering whether the attenuation doctrine applies, a court should consider: (1) The

temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Strieff*, 136 S. Ct. at 2062.

No one factor controls, and other factors also may be relevant to the attenuation analysis. See, e.g., *Brown v. Illinois*, 422 U.S. 590, 600-04, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (giving of *Miranda* warnings, standing alone, cannot support attenuation where confession follows unlawful arrest; but noting giving *Miranda* warnings is relevant factor to consider in determining whether confession was sufficiently attenuated from unlawful arrest); *State v. Martin*, 285 Kan. 994, 1003, 179 P.3d 457 (2008) (noting no single factor is dispositive).

### 1. *Temporal proximity*

With regard to temporal proximity, the *Strieff* Court "declined to find that this factor favors attenuation unless 'substantial time' elapses between an unlawful act and when the evidence is obtained." 136 S. Ct. at 2062. The record shows no substantial lapse in time between Mills' warrantless search and seizure of the purse and Chronister's subsequent search. This factor weighs in favor of suppression.

### 2. *Intervening circumstances*

Here, any intervening circumstances do not weigh in favor of attenuation. To begin with, there were multiple illegalities. First, Mills unlawfully searched the purse, regardless of whether she saw a drug kit. Mills then removed the purse from the vehicle, which was an unlawful seizure. An unlawful seizure of the purse itself was an intervening circumstance between Mills' initial unlawful search and Chronister's later search. As we previously discussed, the State did not meet its burden to prove Mills' warrantless search

26

of the purse did not trigger Mills', Fogarty's, or Russell's suspicions. But even if the search did not cause Mills', Fogarty's, or Russell's suspicions, the initial warrantless seizure of the purse was undisputedly a basis for the officers' suspicions based on Bunce's reaction to seeing her purse removed from the truck.

The intervening circumstances that followed Mills' seizure of the purse consisted of: (1) Mills returning the purse to the truck; (2) Mills relaying to Russell her suspicions there was something illegal in the purse based on either something she saw in the purse or Bunce's reaction to the seizure of the purse; (3) Russell relaying to Lynn and/or Nancy that Bunce's purse was in the truck and Russell believing there was something illegal in the purse; (4) Chronister learning from Nancy that Bunce's purse was in the truck and Bunce did not want it removed from the vehicle; (5) Chronister asking Russell for permission to search the purse and for Russell to take any contraband she might locate; (6) Russell agreeing to Chronister's request and allowing her to use his flashlight to search Bunce's purse; and (7) Chronister retrieving the evidence and giving it to Russell.

There is a significant connection between the officers' suspicions and the nature, scope, and parameters of Chronister's request to search. Chronister testified she was not aware the officers suspected there was something illegal in the purse, but Chronister also testified she asked Russell if she could search the purse almost immediately upon making contact. The district court found Chronister's testimony credible, and Russell also testified they did not discuss what might be in Bunce's purse prior to him giving Chronister permission to search. Russell knew he told Lynn that Bunce's purse was in the vehicle and he suspected something illegal was in the purse. Russell also knew Lynn was sending Nancy to retrieve the truck. Russell saw Chronister arrive with Nancy. It is not clear Russell knew Chronister's name at the time she requested to search, but he knew he was not speaking with Nancy or Bunce. Russell knew Bunce did not want the officers to take or search her purse, yet he gave Chronister permission to search it.

There was no objectively reasonable basis for Russell to believe Chronister had Bunce's permission to search the purse given the fact Chronister asked for Russell's permission. Chronister's request that Russell take anything she did "not want to be legally responsible for" is contrary to Bunce's express wishes. If Bunce did not want the officers to take or search her purse, she necessarily did not want the officers to take items someone else took *from* her purse. Russell did not know the extent to which Chronister was aware of his conversation with Lynn. But given the timing and nature of Chronister's request and the fact she arrived with Nancy, Russell had no objectively reasonable basis to conclude Chronister was unaware of his statements to Lynn when she told him she "was under the understanding . . . there was a purse left in the vehicle, [and] requested permission to search the contents of the purse," and requested to turn over anything she did "not want to be legally responsible for . . . without being legally responsible for it." The intervening circumstances do not weigh in favor of attenuation.

### 3. *Purpose and flagrancy of official misconduct*

There is no evidence as to the purpose and flagrancy of the official misconduct. However, this point is largely irrelevant because there was no significant lapse in time and there were not sufficient intervening circumstances. The record does not support either basis for attenuation, so it is unnecessary to consider whether suppression would still be warranted based on purposeful and flagrant misconduct. See *State v. Christian*, 310 Kan. 229, 240-41, 445 P.3d 183 (2019) ("Even though we cannot fully evaluate the flagrancy factor, the other factors weigh heavily toward a determination that there was no attenuation of the taint of the illegal seizure and the district court should have suppressed the evidence derived from the search. Even if nothing in the record revealed flagrancy, the attenuation doctrine does not allow the admission of the evidence here.").

Based on the State's failure to justify Mills' warrantless search and seizure of the purse or to prove an exception to the exclusionary rule applies, we hold the evidence

28

obtained from Chronister's search of the purse should be suppressed. However, even if Mills' actions did not taint the fruits of Chronister's search, we find the circumstances of Chronister's search still render the evidence subject to suppression.

*Chronister's search*

Bunce also challenges Chronister's search, arguing she was acting as a government agent. The Fourth Amendment protects against unreasonable searches and seizures by government actors. Searches conducted by private citizens generally do not implicate the Fourth Amendment. *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S. Ct. 574, 65 L. Ed. 1048 (1921). But if a private citizen acts as an instrument or agent of the government, the resultant search may implicate the Fourth Amendment. *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971).

A search by a private citizen becomes a government search "if the government coerces, dominates or directs the actions of [the] person" conducting the search. *Pleasant v. Lovell*, 876 F.2d 787, 796 (10th Cir. 1989). To determine if a private citizen has become a government agent, Kansas courts have used a two-prong inquiry: "(1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his or her own ends." *State v. Brittingham*, 296 Kan. 597, Syl. ¶ 3, 294 P.3d 263 (2013). Both prongs must be met for a private search to be considered a government search. *United States v. Leffall*, 82 F.3d 343, 347 (10th Cir. 1996).

The first prong requires us to consider whether the government agent affirmatively encouraged, initiated, or instigated the private action. *United States v. Smythe*, 84 F.3d 1240, 1243 (10th Cir. 1996). The second prong requires us to consider not only the private citizen's state of mind but also the government's role in the search. "A government agent must be involved either directly as a participant—not merely as a witness—or

29

indirectly as an encourager of the private person's search before we will deem the person to be an instrument of the government." *Leffall*, 82 F.3d at 347. But "there exists a 'gray area' between the extremes of overt governmental participation in a search and the complete absence of such participation. See *United States v. Sherwin*, 539 F.2d 1, 6 n.5 (9th Cir. 1976)." *United States v. Walther*, 652 F.2d 788, 791 (9th Cir. 1981).

1. *First prong*

Bunce argues both Fogarty and Russell encouraged Chronister's search. She notes Russell testified he told Lynn he suspected something illegal was in Bunce's purse. Nancy testified an officer told her whoever picked up the truck would be responsible for anything found inside. She also testified she discussed the possibility of getting into legal trouble with Chronister. Fogarty testified she and Russell spoke to Nancy and Chronister about possible contraband in Bunce's purse. Bunce relies on the testimony of Fogarty, Russell, and Nancy. Based on that testimony, Nancy was warned she would be responsible for anything in the truck. If Nancy had conducted the search, this issue would be more clear-cut. But Nancy did not conduct the search—Chronister did.

Chronister testified no one suggested to her something illegal was in the purse or otherwise warned her of any possible legal consequences of taking possession of the truck. The district court found Chronister credible, so this conflict in evidence was resolved in her favor. However, "[t]he totality of the circumstances guides the court's determination as to whether 'the government coerces, dominates or directs the actions of a private person.' [Citation omitted.]" *Smythe*, 84 F.3d at 1243. And the first prong is satisfied where the government agent knew of and acquiesced to the citizen search. *Brittingham*, 296 Kan. 597, Syl. ¶ 3; see *Smythe*, 84 F.3d at 1243 (officer's knowledge of and acquiescence to the search satisfies the requirement that the government agent affirmatively encourage, initiate, or instigate the private action).

Russell knew of Chronister's search because she asked him if she could search Bunce's purse. He permitted her to do so, gave her his flashlight to use during the search, and stood by watching the search. In permitting Chronister to search the purse, Russell also agreed to take anything Chronister found that she did "not want to be legally responsible for . . . without [Chronister] being legally responsible for it." Here, Russell knew of and acquiesced to Chronister's search. And we must consider Russell's actions in the totality of the circumstances. See *Smythe*, 84 F.3d at 1243.

Russell and Chronister both knew the truck belonged to Lynn and the purse belonged to Bunce. Russell knew Chronister was not Bunce or Lynn. He knew Chronister arrived with Nancy, but he saw Nancy talking to Fogarty when Chronister approached him. Russell knew he was not speaking with the owner of the purse, the owner of the truck, or Nancy—the person Lynn told Russell he was sending to retrieve the truck. But Russell allowed Chronister to search Bunce's purse for contraband and agreed to take any contraband she might find. Giving Chronister permission to search was significant in the totality of the circumstances because Chronister had no inherent possessory or ownership interest in the purse or truck. This is particularly relevant because at the time of the search, Chronister had not taken possession of the truck. Both the truck and purse were still under Russell's control; Bunce had not relinquished control of her purse to Chronister or given her permission to search it. This is a significantly different scenario from other cases in which courts have upheld citizen searches.

In *Smythe*, the manager of a bus stop became suspicious when two men approached him, handed him a package labeled with a fictitious name, and requested it be shipped to California. The manager first attempted to determine his authority to open the package under company policy, then called law enforcement. An officer responded and told the manager he believed the manager could open the package, but the officer could not. The officer then walked away as the manager opened the package. The *Smythe* court found the manager had a:

31

"'legitimate, independent motivation' to search the package, . . . namely, his independently formed belief that something was dangerous about the package . . . and his concern for the passengers on the bus on which the package was to be shipped. . . . and the district court . . . concluded . . . [the Manager] 'would have opened the package even if the police had not responded to his call.' [Citations omitted.]" 84 F.3d at 1243.

In *Jacobsen*, employees of Federal Express examined the contents of a package that had been damaged. They needed to inspect the contents based on company policy regarding insurance claims. During their inspection of the package's contents, they discovered suspected cocaine. At that point, they contacted the Drug Enforcement Administration (DEA). 466 U.S. at 111-12. In *Coolidge*, officers were investigating a murder and questioned Coolidge. Coolidge allowed the officers to inspect three of his firearms. Later that week, two other officers came to Coolidge's home and spoke with his wife. They asked her if Coolidge had been home on the night of the murder. She told them he had not been home but offered to retrieve some of his clothing and firearms, believing it would exonerate her husband. 403 U.S. at 485-90. The Court found:

"In assessing the claim that this course of conduct amounted to a search and seizure, it is well to keep in mind that Mrs. Coolidge described her own motive as that of clearing her husband, and that she believed that she had nothing to hide. She had seen her husband himself produce his guns for two other policemen earlier in the week, and there is nothing to indicate that she realized that he had offered only three of them for inspection on that occasion." *Coolidge*, 403 U.S. at 489.

In *United States v. Miller*, 688 F.2d 652 (9th Cir. 1982), the owner of a trailer had his trailer and other equipment stolen. The owner later received an anonymous tip the trailer was parked along Miller's property with a "'for sale'" sign on it. The owner contacted law enforcement officers who drove past Miller's property to see if they could locate the trailer parked along the frontage road leading to Miller's property. The officers saw two trailers but could not confirm if either was the one the owner described. The

32

officers invited the owner to their location to attempt to identify the trailer from the frontage road. The owner thought one of the two trailers might be his when he drove past but was not sure. The owner proposed he pose as a prospective buyer in order to enter onto the property. The owner then made contact with Miller's son and located his trailer in a shop on Miller's property. The owner reported his observations to the law enforcement officers who suggested they obtain a warrant. The owner stated he wanted to go back onto the property to take pictures of the trailer. The officers advised him not to, but he did so anyway. An officer observed the owner from a distance using binoculars as he reentered the property and took pictures. One of the officers watched out of concern for the owner's safety, but the officer did not enter Miller's property.

The *Miller* court found it significant the officers were not encouraging the owner to do something the officers could not lawfully do by inviting him to identify the trailers located along the frontage road. And the officers only gave the owner tacit approval when he proposed entering onto the property under the guise of a prospective buyer—"the officers told [the owner] it was up to him." 688 F.2d at 657. Further, when the owner went back onto Miller's property to take pictures, the officer stayed off Miller's property and observed the owner from a distance "out of concern for [the owner's] safety, not out of any desire to reap the benefits of a private search." 688 F.2d at 658.

*Jacobsen*, *Coolidge*, *Smythe*, and *Miller* are all distinguishable from the facts here. In those cases, the property searched had either been voluntarily transmitted to the private citizen by its owner, or the citizen gained access to the property *without* permission from law enforcement. And law enforcement did not have control over the property. Here, Russell had control over the truck and its contents when Chronister requested permission to search. As we have already explained, the record reflects Chronister's search was contingent upon Russell giving her permission to do so because Chronister did not want to take possession of the truck without first making sure there was not anything inside she did "not want to be legally responsible for." But this was also contingent upon Russell

33

agreeing to take anything Chronister found "without [Chronister] being legally responsible for it." Russell's knowledge and acquiescence to Chronister's search—his express consent to her request to search, agreement to take anything Chronister found, and Russell standing nearby during the search—are sufficient to show Russell directed Chronister's actions under the totality of the circumstances. See *Smythe*, 84 F.3d at 1243.

2. *Second prong*

Bunce argues Russell was directly involved in the search. She again relies on Nancy's testimony. According to Nancy, Russell implied Bunce's purse had something illegal in it and asked if they would like to search it. But again, this testimony conflicted with Chronister's, and the district court resolved that conflict in Chronister's favor. Bunce argues Russell was directly involved in the search because Chronister asked Russell if she could search the purse, she used Russell's flashlight during the search, and Russell took the glasses case she found.

In analyzing the second prong, we must look at both Chronister's state of mind and Russell's role in the search. See *Leffall*, 82 F.3d at 347. Chronister testified no one told her there might be contraband in the purse or that she might be held responsible for it. She wanted to search the purse because she was a naturally distrustful person. The pertinent question is whether this was a "'legitimate, independent motivation'" to search. *Smythe*, 84 F.3d at 1243 (quoting *Walther*, 652 F.2d at 792). But there is "a 'gray area' between the extremes of overt governmental participation in a search and the complete absence of such participation." *Walther*, 652 F.2d at 791 (quoting *United States v. Sherwin*, 539 F.2d 1, 6 n.5).

Here, Chronister's express purpose for conducting the search was not to aid law enforcement. However, we cannot ignore that the express terms of her request—searching for contraband and turning over anything she found—aided law enforcement,

34

whether Chronister knew it or not. This is because Chronister's subjective intent—making sure there was not anything inside the purse she did "not want to be legally responsible for"—was only fulfilled, and, therefore, incentivized, by Russell's agreement to take anything Chronister found "without [Chronister] being legally responsible for it." When the government provides an incentive for a citizen search, it may be deemed to be sufficiently involved in the search even though the government did not actually know of or permit the search. See *Walther*, 652 F.2d at 791-93 (search of package for drugs by airline employee was government search because the employee did so based on prior occasions in which he was rewarded for providing information to DEA).

Russell's agreement to take anything Chronister found may be less of an overt incentive than the DEA paying an airline employee for information about suspicious passengers in *Walther*. But Russell was directly involved in permitting Chronister's search, whereas law enforcement had no knowledge of the airline employee's search in *Walther*. The airline employee also gained access to the package without permission from law enforcement. He had no reason not to expect payment. See *Walther*, 652 F.2d at 791-93. Here, Chronister only gained access to Bunce's purse based on Russell's permission to search. Although Chronister had no particular reason to suspect she would find anything illegal in the purse, she had every reason to expect Russell would take anything she found based on Russell expressly agreeing to do so.

Further, Chronister knew it was Bunce's purse. Because Chronister knew it was someone else's purse, she had no objectively reasonable basis to believe she had inherent authority to search it. She also knew it was not Nancy's purse; thus, she had no objectively reasonable basis to believe any authority Nancy gave Chronister to drive Lynn's truck included authority to search Bunce's purse. Chronister had no objectively reasonable basis to believe Bunce would want her to search the purse. She also knew Bunce did not want the purse removed from the vehicle. It naturally follows that if Bunce did not want the *entire purse* removed from the vehicle, she did not want individual items

35

taken from the purse to be removed from the vehicle. Chronister's knowledge of the circumstances makes Russell's permission to search and agreement to take anything she found significant.

While Chronister was not asked or told to search the purse, the nature and scope of her request and subjective purpose of the search fall on the wrong side of the "'gray area' between the extremes of overt governmental participation in a search and the complete absence of such participation." *Walther*, 652 F.2d at 791 (quoting *Sherwin*, 539 F.2d at 6 n.5). Here, Russell gave Chronister permission to do something he could not lawfully do. Chronister's subjective purpose—searching for contraband before taking the truck—was incentivized by Russell agreeing to take any contraband Chronister found, so she would not be "legally responsible for it." And Russell's investigatory interests were directly furthered by allowing Chronister to search for and turn over any contraband he already had a hunch would be in the purse. Russell was involved in Chronister's search, and we cannot deem his contact with Chronister or his indirect involvement in the search minor or *de minimis*. Under the totality of the circumstances, this was not a lawful citizen search. See *Smythe*, 84 F.3d at 1243; *Miller*, 688 F.2d at 657-58; *Walther*, 652 F.2d at 791-93. The evidence obtained from Chronister's search should have been suppressed irrespective of Mills' prior warrantless search and seizure of the purse.

We remand with instructions for the district court to grant Bunce's motion to suppress the evidence obtained from her purse.

Reversed and remanded with directions.